# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, on its
own behalf and on behalf of the
PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,

and

STATE OF NEW MEXICO, *ex rel.*
State Engineer,
                Plaintiffs,                                83cv01041 MV-ACE
                                                      JEMEZ RIVER ADJUDICATION
and

THE PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,
                Plaintiffs-in-Intervention,

v.

TOM ABOUSLEMAN, *et al.*,
                Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on  Defendants' Objection to "Report of Special Master" (Doc. No. 1985, filed September 28, 1988), Objection of the United States and the Pueblos of Jemez, Zia, and Santa Ana to the Report of the Special Master (Doc. No. 1986, filed September 29, 1988), the United States' and Pueblos' of Jemez, Santa Ana and Zia Motion for Action on Special Master's Report (Doc. No. 1999, filed October 19, 1988), Defendants' Cross Motion for Action on Defendants' Objection to the Special Master's Report and Reply to the "Response of the United States and the Pueblos . . . to Certain Defendants' Objection to the Report of the Special Master" (Doc. No. 2000, filed October 24, 1988), and the Objections of the United States and the Pueblos of Jemez, Santa Ana, and Zia to the Report of the Special Master on the Pueblos [sic] Existing and

Historical Water Uses (Doc. No. 2294, filed October 15, 1991). The Court has reviewed the submissions of the Parties and the relevant law. The United States' and Pueblos' of Jemez, Santa Ana and Zia Motion for Action on Special Master's Report (Doc. No. 1999, filed October 19, 1988), and Defendants' Motion for Action on Defendants' Objection to the Special Master's Report (Doc. No. 2000, filed October 24, 1988) shall be granted. For the reasons given below, Defendants' Motion for Partial Summary Judgment, (Doc. No. 1935, filed June 9, 1988), and New Mexico's Motion for Partial Summary Judgment, (Doc. No. 1938, filed June 9, 1988), shall both be granted in part and denied in part. The Special Master's Report on the Pueblos' Future Use Claims, (Doc. No. 1980, filed September 14, 1988), shall be rejected as moot. Defendants' Objection to "Report of Special Master" (Doc. No. 1985, filed September 28, 1988), and the Objection of the United States and the Pueblos of Jemez, Zia, and Santa Ana to the Report of the Special Master (Doc. No. 1986, filed September 29, 1988) shall both be overruled as moot.

**PROCEDURAL HISTORY**

The United States initiated this adjudication by filing a Complaint (Doc. No. 1) on June 27, 1983. On September 15, 1986, the United States served the Parties with its Statement of Water Claims made on behalf of the Pueblos of Jemez, Santa Ana and Zia. (*See* Doc. No. 4005, filed April 23, 2004). The Pueblos also filed Statements of Water Claims on their own behalf. (Jemez, Doc. No. 1523, filed December 15, 1986; Santa Ana, Doc. No. 1485, December 1, 1986; Zia, Doc. No. 1522, filed December 15, 1986). On June 9, 1988, the State of New Mexico and certain Defendants filed two motions for partial summary judgment regarding the legal bases of the Pueblos' water rights. (Doc. Nos. 1935 and 1938). The Special Master addressed the Pueblos' water rights claims and the two motions for partial summary judgment in two reports, one addressing the Pueblos' historic and

2

existing water use claims and the other addressing the Pueblos' future use claims.

The historic and existing use claims were the subject of six days of evidentiary hearings before Special Master Zinn in July and December, 1988.  Special Master Zinn filed a report (Doc. No. 2291, filed October 1, 1991) with his findings of fact and recommended conclusions regarding the Pueblos' water rights based upon past and present uses of water.  The United States and Pueblos objected (Doc. No. 2294, filed October 15, 1991) to his report claiming that the Special Master erred on 20 issues.  The underlying basis for many of the claimed errors is that the Special Master erred by applying state, rather than federal, law to the Pueblos' historic and existing water use claims.  None of the Parties filed briefs on the United States' and Pueblos' objections at that time.

The Pueblos' future water use claims were addressed in a Special Master Report (Doc. No. 1980, filed September 14, 1988), objections, oral argument, additional briefing and requested findings and conclusions.[1]

---

[1]**Documents Relating to Pueblo Future Use Claims Filed in 1988-1990**

| Date Filed | Doc. No. | Description |
|---|---|---|
| June 9, 1988 | 1935 1937 | Defendants' **Motion** for Partial Summary Judgment on Pueblos' reserved rights claims, and **Brief** in support |
| June 9, 1988 | 1938 1939 | New Mexico's **Motion** for Partial Summary Judgment re: Pueblos' claims, and **Memorandum** in support |
| June 17, 1988 | 1945 | United States' and Pueblos' **Response** to New Mexico's Motion for Partial Summary Judgment |
| June 17, 1988 | 1946 | United States' and Pueblos' **Response** to Certain Defendants' Motion for Partial Summary Judgment |
| June 20, 1988 | 1947 | **Supplement** to Response to Certain Defendants and State of New Mexico Filed by the United States and the Pueblos of Jemez, Zia and Santa Ana |
| June 23, 1988 | 1950 | Defendants' **Reply** Brief |

| | | |
|---|---|---|
| June 23, 1988 | 1951 | New Mexico's **Reply** to the United States' and Pueblos' Response to Motion for Partial Summary Judgment |
| June 24, 1988 | 1953 | **Errata** to United States' and Pueblos' Response to New Mexico's Motion for Partial Summary Judgment |
| September 14, 1988 | 1980 | **Report** of the Special Master |
| September 28, 1988 | 1985 | Defendants' **Objection** to "Report of Special Master" |
| September 29, 1988 | 1986 | **Objection** of the United States and the Pueblos of Jemez, Zia, and Santa Ana to the Report of the Special Master |
| September 30, 1988 | 1987 | **Memorandum** in Support of Objections and Exceptions of the United States and the Pueblos of Jemez, Zia, and Santa Ana to the Report of the Special Master |
| October 11, 1988 | 1996 | **Response** of the United States and the Pueblos of Jemez, Zia, and Santa Ana to Certain Defendants' Objection to the Report of Special Master |
| October 19, 1988 | 1999 | **Motion** for Action on Special Master's Report by the United States and the Pueblos of Jemez, Zia and Santa Ana |
| October 24, 1988 | 2000 | **Cross Motion** for Action on Defendants' objection to the Special Master's Report and **Reply** to the "Response of the United States and the Pueblos . . . to Certain Defendants' Objection to the Report of the Special Master" |
| November 9, 1988 | 2006 | **Response** to the United States and Pueblos [sic] Objections to the Report of the Special Master, by New Mexico |
| November 22, 1988 | 2011 | Defendants' **Brief** in Support of Adoption of the Majority of the Report of the Special Master, and, Defendants' **Response** to "Memorandum in Support of Objections and Exceptions of the United States and the Pueblos . . . to Report a [sic] Special Master" |
| December 5, 1988 | 2014 | **Reply** of the United States and the Pueblos to the Responses of the State of New Mexico and Certain Private Defendants to the United States' and the Pueblos' Objections to the Report of the Special Master |
| January 19, 1990 | 2195 | **Proposed Findings of Fact and Conclusions of Law** for New Mexico's Motion for Partial Summary Judgment |
| January 19, 1990 | 2196 | Defendants' **Requested Findings of Fact and Conclusions of Law** |

4

The Court held a status conference on January 29, 2004, and subsequently allowed the Parties to file: (1) briefs regarding the objections to the Special Master's Report on the Pueblos' historic and existing use claims, (2) supplemental briefs for the for the sole purpose of advising the Court of any new law arising after January 1, 1990, the Parties deem applicable to the Pueblo water rights issues addressed in the Special Master's Report on the Pueblos' future use claims, and (3) revised proposed findings of fact and conclusions of law.  (Order, Doc. No. 4002, filed February 4, 2004).

## STANDARDS OF REVIEW

The Court has reviewed the two motions for partial summary judgment, the two Special Master's reports, the objections to the Special Master's reports, and the relevant briefs, including those filed pursuant to the Court's Order of February 4, 2004 (Doc. No. 4002).

In acting on a special master's report and recommendations, the Court may adopt, modify or reject, wholly or partly, and must decide *de novo* all objections to the special master's recommended conclusions of law.  FED. R. CIV. P. 53(g)(1) and (4).  The Court's review must be substantive.  *See Burlington N. R.R. Co. v. Dept. of Rev. of Wash.,* 934 F.2d 1064, 1074 (9th Cir. 1991) (court cannot act as a mere rubber stamp for the conclusions of the master).   The ultimate adjudicatory determination is reserved to the Court.  *See La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (the use of masters is to aid judges in the performance of specific judicial duties and not to displace the court).  The purpose behind the requirement for a *de novo* determination is that the Court, in making the ultimate determination of a matter, would have to give fresh consideration to those issues to which specific objection has been made by a party.  *See United States v. Raddatz*, 447 U.S. 667,

---

January 19, 1990          2198      **Proposed Findings of Fact and Conclusions of Law** Submitted
                                    by the United States, and the Pueblos of Jemez, Santa Ana and Zia
                                    in Support of Objections to the Special Master's Report of Sept. 14, 1988

675-677 (1980) (discussing congressional intent behind *de novo* review standard in Federal Magistrates Act).  The Court may also decide conclusions of law *de novo* when no objection is made. FED. R. CIV. P. 53 advisory committee's note (2003 Amendment).

The Parties have requested that the Court review the Special Master's findings of fact for the Pueblos' historical and existing use claims under the clearly erroneous standard that was in effect when the Special Master filed his report.  (*See* Doc. Nos. 4008-4010, 4012-4014, filed May 3, 2004). FED. R. CIV. P. 53 was amended on December 1, 2003. Under the amended rule, the court must decide all objections to a master's recommended findings of fact *de novo*, unless the parties have stipulated with the court's consent that the findings will be reviewed for clear error.  *See* FED. R. CIV. P. 53(g)(3).  The Supreme Court's order of March 27, 2003, amending Rule 53 "shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."  For the reasons given below, it would be premature for the Court to rule on the findings of fact at this time.  Therefore, the issue of which standard of review should apply to the objections to the findings of fact will not be decided at this time.

The Court's *de novo* determination of the objections to the Special Master's conclusions of law will begin with the two motions for partial summary judgment.  *See United States v. Raddatz*, 447 U.S. 667,  676 (1980) (in providing for a *de novo* determination, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate judge's proposed recommendations for disposition of a motion for summary judgment).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.  FED. R. CIV. P. 56(c).  When applying this standard, a court must view the evidence and draw

reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Simms v.*

*Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir.

1999).  The party seeking summary judgment bears the initial burden of demonstrating the absence

of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Once the movant

carries this burden, the nonmovant cannot rest upon his or her pleadings, but must bring forward

specific facts showing a genuine issue for trial as to those dispositive matters for which he or she

carries the burden of proof.  *Id.*  A mere scintilla of evidence supporting the nonmoving party's theory

does not create a genuine issue of material fact.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171,

1175 (10th Cir. 1999).  Instead, the nonmoving party must present facts such that under the

applicable law, a reasonable jury could find in its favor.  *Id.*

## PUEBLO HISTORICAL BACKGROUND

The Jemez, Santa Ana and Zia Indians occupied the Jemez River Basin prior to the time of

Spanish contact in 1540.  (Stip. ¶¶ 1-2, Doc. No. 1865, filed February 22, 1988).  At the time of

Spanish contact, the three Pueblos were engaged in varied subsistence strategies including hunting,

gathering and farming.  *Id.* ¶ 3.  The Pueblos' farming techniques included irrigation via diversion of

surface water.  *Id.* ¶ 4.

**Pueblo Status Under Spanish Government**

The three Pueblos received land grants from the King of Spain.  (United States' Compl.

¶¶ VII-IX, Doc. No. 1, filed June 27, 1983); *United States v. Sandoval*, 231 U.S. 28, 39 (1913)

(lands belonging to pueblos were held in communal, fee-simple ownership under grants from the King

of Spain).  During Spanish dominion, the Pueblo Indians, although having full title to their lands, were

treated as wards requiring special protection and were subjected to restraints and official supervision in the alienation of their property. *Sandoval*, 231 U.S. at 44; *United States v. Candelaria*, 271 U.S. 432, 442 (1926). Spain ruled the area until 1821 when Mexico won independence. *See United States v. Lucero*, 1 N.M. 422 (N.M. Terr. 1869).

**Pueblo Status Under Mexican Government**

The Mexican revolutionary government adopted the Plan of Iguala on February 24, 1821, a short time before the subversion of the Spanish government. *United States v. Ritchie*, 58 U.S. 525, 538 (1854). The Plan of Iguala declared that "all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy," and that "the person and property of every citizen will be respected and protected by the [Mexican] government." *Id.* The treaty between Spain and the new Mexican government, and the Mexican declaration of independence reaffirmed the principles of the Plan of Iguala. *Id.* Mexico ruled the area until it ceded the territory to the United States in 1848.

**Cession to United States Under Treaty of Guadalupe Hidalgo**

Mexico ceded the area to the United States in the Treaty of Guadalupe Hidalgo. 9 Stat. 922 (1848); *see also Pueblos of Zia, Jemez and Santa Ana v. United States*, 165 Ct. Cl. 501 (Ct. Cl. 1964). In the Treaty of Guadalupe Hidalgo, the United States agreed to protect rights recognized by the Spanish and Mexican governments. *New Mexico v. Aamodt*, 537 F.2d 1102, 1108-1109 (10th Cir. 1976) ("*Aamodt I*"). The Treaty states in relevant portion:

ARTICLE VIII.

Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to

the Mexican republic, *retaining the property which they possess in the said territories*, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax, or charge whatever.

Those who shall prefer to remain in the said territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty; and those who shall remain in the said territories after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States.

In the said territories, *property of every kind, now belonging to Mexicans not established there, shall be inviolably respected*. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States.

ARTICLE IX.

Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and *protected in the free enjoyment of their liberty and property*, and secured in the free exercise of their religion without restriction.

9 Stat. 922 (1848) (*emphasis added*).

**Protection of Rights Recognized by Prior Sovereigns**

The United States protected the property rights of Mexicans in the ceded territory by establishing the Office of the Surveyor-General in New Mexico. *See* Act to Establish the Offices of Surveyor-General of New Mexico, Kansas, and Nebraska, 10 Stat. 308 (1854). It was the duty of the Surveyor-General to ascertain the origin, nature, character, and extent of all claims, including

those of the Pueblos, to lands under the laws, usages, and customs of Spain and Mexico, and to report his findings to Congress.  10 Stat. 308, 309 (1854).  Congress confirmed the land claims of Jemez and Zia Pueblos in 1859, 11 Stat. 374, and Santa Ana Pueblo in 1869, 15 Stat. 438.  The two acts confirming the land titles of the three Pueblos contained a proviso that "the confirmation shall only be construed as a relinquishment of title on the part of the United States, and shall not affect any adverse valid right, should any such exist."  11 Stat. 374 (1859); 15 Stat. 438 (1869).

**Pueblos' Status as Indians**

Early confusion regarding whether the Pueblos were "Indians," and therefore entitled to protection of federal laws, led to much of the Pueblos' land being transferred to non-Indians.  In 1834, 14 years before the Treaty of Guadalupe Hidalgo, Congress had enacted the Indian Trade and Intercourse Act, 4 Stat. 729, which, among other things, made the purchase or grant of land from Indians invalid, unless the conveyance was made by treaty or convention entered into pursuant to the Constitution.  In 1851, three years after the Treaty of Guadalupe Hidalgo, Congress passed an act extending the Indian Trade and Intercourse Act over the Indian tribes in the Territory of New Mexico.  9 Stat. 574, 587 (1851).  In the late 1800s, the New Mexico Territorial Supreme Court in *United States v. Lucero*, 1 N.M. 422 (N.M. Terr. 1869), and later the United States Supreme Court in *United States v. Joseph*, 94 U.S. 614 (1876), ruled that the Pueblos are not Indian tribes within the meaning of the Indian Trade and Intercourse Act.  However, in the early 1900s, Congress, in the New Mexico Enabling Act, 36 Stat. 557 (1910), and the Supreme Court, in *United States v. Sandoval*, 231 U.S. 28, 47 (1913), and in *United States v. Candelaria*, 271 U.S. 432, 441(1926), made clear that the Pueblos were indeed Indians, subject to the legislation of Congress and the exercise of its guardianship over Indians.

10

In determining that the Pueblos were not "Indians," the Supreme Court of the Territory of New Mexico distinguished the civilized Pueblos, who lived in towns and cultivated the soil, from the "barbarous Indians" of the "savage tribes" that were "given to war and the chase for a living." *See Lucero*, 1 N.M. at 430-431, 452-454; *see also United States v. Mares,* 14 N.M. 1 (N.M. Terr. 1907) (with respect to the prohibition of the sale of intoxicants to Indians, Pueblos are not Indians over whom the government exercises guardianship). In *Lucero*, the United States sought to recover a statutory penalty for settlement upon lands of belonging to an Indian tribe, in this case the Cochiti Pueblo, in violation of the Indian Trade and Intercourse Act. *Lucero*, 1 N.M. at 423-424. The Territorial Court found that the purpose of the relevant section of the Indian Trade and Intercourse Act was to protect uncivilized Indians in the peaceable enjoyment of lands set apart for their use by treaty with the United States. *Id.* at 445. The Pueblos, on the other hand, were intelligent citizens of the United States, living in fixed communities, each having its own municipal or local government and having complete title to their lands. *Id.* at 453-454. The Territorial Court reasoned that the Pueblos have a full and ample remedy via the courts, like any other landowner, to protect and defend their title to their land, and do not need any assistance from United States statutes to protect their title. *Id.* at 444.

Seven years after the Territorial Court's decision in *Lucero*, the United States Supreme Court also ruled that the Pueblos were not Indians within the meaning of the Indian Trade and Intercourse Act. *United States v. Joseph*, 94 U.S. 614 (1876). In *Joseph*, the United States brought suit to recover a penalty from a person who settled upon land belonging to the Pueblo of Taos, in violation of the Indian Trade and Intercourse Act. *Id.* at 615. The *Joseph* court stated that the Indian Trade and Intercourse Act applied to those Indian Tribes on land where the ultimate title has been always

held to be in the United States, with no right in the Indians to transfer it, or even their possession, without consent of the government. *Id.* at 618. "It is this fixed claim of dominion which lies at the foundation of the act forbidding the white man to make a settlement on the lands occupied by an Indian tribe." *Id.* The Pueblos, on the contrary, hold their lands by a right superior to that of the United States via title protected by the Treaty of Guadalupe Hidalgo. *Id.* If a person is on Pueblo land without consent of the Pueblo, he may be ejected, or punished civilly by a suit for trespass, according to the laws regulating such matters in the Territory. *Id.* If he is there with the Pueblo's consent, there is no injury to the United States, nor does he violate any statute in that regard. *Id.*

The decision in *Joseph* placing the Pueblos outside the protection of federal laws resulted in the acquisition and occupation by non-Indians of land within the Pueblos. *Aamodt I*, 537 F.2d at 1109. Congress, evidently wishing to make sure that the lands owned and occupied by the Pueblo Indians should be treated as Indian country, expressly declared so in the New Mexico Enabling Act. *See* 36 Stat. 557 (1910) ("[the term Indian country] shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico"). Congress also included in the New Mexico Enabling Act, 33 Stat. 1069 (1905), a declaration that, with regard to the federal prohibition of the introduction of liquor into Indian country, the terms "Indian" and "Indian country" shall include the Pueblo Indians and their lands, thereby negating the holding in *United States v. Mares,* 14 N.M. 1 (N.M. Terr. 1907), that Pueblos are not Indians over whom the government exercises guardianship with respect to the prohibition of the sale of intoxicants to Indians. That Congress considered the Pueblos to be Indians is further evidenced by the terms of the Act annulling the taxes already levied and forbidding further levies, enacted only one year after the New Mexico Territorial Supreme Court ruled that the lands of Pueblos Indians are taxable. *See* 33 Stat. 1069 (1905); *Territory v. Persons,*

12

*etc. in Delinquent Tax List of Bernalillo County for 1899*, 76 P. 307 (N.M. Terr. 1904).

Finally, in 1913, the United States Supreme Court recognized the Pueblos as Indian tribes, noting that beginning as early as 1854 and continuing up to 1913, the legislative and executive branches of the federal government have regarded and treated the Pueblos like other Indian tribes. *United States v. Sandoval*, 231 U.S. 28, 47 (1913) (lands of Pueblo Indians of New Mexico are subject to legislation of Congress and the exercise of its guardianship over Indians). The Supreme Court dismissed the "observations" in *Joseph* that were "not in accord" with the ruling in *Sandoval*, stating that *Joseph* "did not turn upon the power of Congress over [the Pueblos] or their property." *Sandoval*, 231 U.S. 48; *see also Joseph* at 615 (although the *Joseph* Court ruled the Pueblo is not an Indian tribe within the meaning of the Indian Trade and Intercourse Act, the primary issue was whether a person who settled upon land belonging to the Pueblo was liable to a penalty under said Act). Later, in a case that did turn upon the power of Congress over Pueblos and their property, the Supreme Court ruled that the provision in Indian Trade and Intercourse Act prohibiting purchase of lands from Indians applies to the Pueblo Indians   *United States v. Candelaria*, 271 U.S. 432, 441(1926) ("[w]hile there is no express reference in the provision to Pueblo Indians, we think it must be taken as including them").

**Pueblos' Grant and Trust Lands**

The lands of the Pueblos fall into one of two general categories: grant lands and trust lands. "Grant lands" refer to those lands granted to the Pueblos by prior sovereigns and where the Pueblos' title to those lands has not been extinguished.  *See* Act Confirming Land Claims of [Jemez and Zia Pueblos], 11 Stat. 374 (1859); Act Confirming Land Claims of Santa Ana Pueblo, 15 Stat. 438 (1869); Pueblo Lands Act, 43 Stat. 636 (1924);   "Trust lands" refer to those lands held in trust by

the United States for the benefit of and use by the Pueblos.  *See, e.g.,* Act of April 12, 1924, 43 Stat. 92 (1924);  Act of August 13, 1949, 63 Stat. 604 (1949);  Act of August 2, 1956, 70 Stat. 941-942 (1956); Act of September 14, 1961, 75 Stat. 500-503 (1961);  Act of October 21, 1978, 92 Stat. 1672, (1978);  Act of October 21, 1978, 92 Stat. 1679, (1978);  Act of November 5, 1986, 100 Stat. 3354 (1986).

The *Sandoval* decision overturning *Joseph* caused uncertainty as to the titles of both the Pueblos and the non-Indians.  *See Aamodt I*, 537 F.2d at 1109.  To resolve that uncertainty, Congress enacted the Pueblo Lands Act of 1924, 43 Stat. 636, to quiet title to lands within Pueblo Indian land grants.  It directed the Pueblo Lands Board to investigate and determine the lands of which the Indian title had not been extinguished.  43 Stat. 636.  The Pueblo Lands Act of 1933, 48 Stat. 108, authorized funds for purchasing lands and water rights, to replace those divested from said Pueblos.  The Pueblos retained some of the lands that were granted to them by Spain and were compensated for those grant lands the titles to which had been extinguished in accordance with the provisions of the Pueblo Lands Act.

In addition to recognizing the Pueblos' Spanish/Mexican land grants, the United States set aside land for the benefit, use and occupancy of the Pueblos of Jemez, Santa Ana and Zuni.  *See, e.g.,* Act of April 12, 1924, 43 Stat. 92 (1924) (reservation of land for benefit, use and occupancy of the Indians of Zia Pueblo);  Act of August 13, 1949, 63 Stat. 604 (1949) (land held in trust by United States);  Act of August 2, 1956, 70 Stat. 941-942 (1956) (United States holds land in trust for the Pueblos of Zia and Jemez); Act of September 14, 1961, 75 Stat. 500-503 (1961) (land held in trust by United States for Pueblos of Santa Ana, Zia and Jemez); Act of October 21, 1978, 92 Stat. 1672, (1978) (land held in trust by United States for Pueblo of Santa Ana);  Act of October 21, 1978, 92

14

Stat. 1679, (1978) (land held in trust by United States for Pueblo of Zia);  Act of November 5, 1986,

100 Stat. 3354 (1986) (land held in trust by United States for Pueblo of Zia).

### SPECIAL MASTER'S REPORT ON PUEBLOS' FUTURE USE CLAIMS

The issue before the Court arose in 1988 when Defendants and the State filed their Motions

for Partial Summary Judgment (Doc. Nos. 1935 and 1938, filed June 9, 1988) seeking rulings on the

legal bases for some of the Pueblos' water rights claims ("future use claims").  On September 14,

1988, the Special Master filed a Report in which he recommended a determination of the two

Motions. (Doc. No. 1980).  Defendants, (Doc. No. 1985, filed September 28, 1988), and the United

States, with the Pueblos of Jemez, Santa Ana and Zia, (Doc. No. 1986, filed September 29, 1988),

filed objections, including supporting briefs and responses, to the Special Master's Report.  The

Parties also filed supplemental briefs advising the Court of new law, applicable to the Pueblo water

rights issues, arising during the 16-year period between the filing of the Special Master's Report and

the Court's acting on the Report and recommendations.  (*See* Order, Doc. No. 4002, filed February

4, 2004).

The Court has made *de novo* determinations on each of the issues raised in the States' and

Defendants' Motions for Partial Summary Judgment.  Pursuant to this review, the Court will reject

as moot the Special Master's Report on the Pueblos' Future Use Claims, (Doc. No. 1980, filed

September 14, 1988), which recommended determinations of the two Motions for Partial Summary

Judgment. Accordingly, the Objections to the Special Master's Report filed by Defendants (Doc. No.

1985, September 28, 1988) and by the United States and Pueblos of Jemez, Santa Ana and Zia (Doc.

No. 1986, filed September 29, 1988) shall be overruled as moot.

The Court notes that the Special Master's Report on the Pueblos' future use claims, and the

associated objections and briefs, discuss the issues of whether the Pueblos are entitled to riparian rights and whether the Pueblos' aboriginal rights have been extinguished.  The Court declines to rule on these issues at this time because they were not properly raised in the Motions for Partial Summary Judgment.  While the Court possesses the power to enter summary judgments *sua sponte*,  it can do so only so long as the losing party was on notice that it had to come forward with all of its evidence, and the Court has not given the Parties in this case the required notice.  *See Celotex Corp. v. Catrett*, 477 U.S. 3317, 326 (1986); *see also Proctor & Gamble Co. v. Haugen*, 317 F.3d 1121, 1132 (10th Cir. 2003) (the practice of granting summary judgment *sua sponte* is not favored).

## NEW MEXICO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

New Mexico's Motion for Partial Summary Judgment (Doc. No. 1938, filed June 9, 1988) is somewhat vague stating that the State "requests that the issues for trial be narrowed, the theories proffered by the United States and the Pueblos be eliminated as a matter of law, and the evidence at trial be limited to evidence of the Pueblo's [sic] actual historical use of water."  Based upon New Mexico's Memorandum in Support of its Motion for Summary Judgment (Doc. No. 1939, filed June 9, 1988; "N.M.'s Mem."), the Court understands that the State of New Mexico seeks rulings as follow:

1.     The proper quantification for the water rights of the Pueblos of Jemez, Zia and Santa Ana is the actual, historical use by the Pueblos, (N.M.'s Mem. at 4);

2.a.     Aboriginal title is not a basis for property ownership of a water right, (N.M.'s Mem. at 7);

2.b     Neither the alleged grants to the Pueblos nor operation of Spanish and Mexican law conferred a water right apart from actual uses, (N.M.'s Mem. at 9);

2.c.    The *Winters* Doctrine, *Winters v. United States*, 207 U.S. 564 (1908), does not apply to Pueblo grant lands, (N.M.'s Mem. at 11);

2.d.    *Winans* treaty rights, *United States v. Winans*, 198 U.S. 371 (1905), do not apply to the Pueblos [sic] grant lands, (N.M.'s Mem. at 16);

**Proper Quantification of the Pueblos' Water Rights on Grant Lands**

The State of New Mexico seeks a ruling that the proper quantification for the water rights of the Pueblos of Jemez, Zia and Santa Ana is the actual, historical use by the Pueblos.[2]  New Mexico claims that the Treaty of Gualalupe Hidalgo fixed Pueblo water rights to the amount historically used. To support its claim, New Mexico argues that the *Winters* and *Winans* doctrines do not apply to the Pueblos, the *Aamodt* district court awarded Pueblo water rights on the basis of actual historical use, there is no other workable standard to quantify the Pueblos' water rights, and the Treaty of Guadalupe Hidalgo did not protect non-vested water rights.

New Mexico relies in part on the fact that the *Aamodt* District Court awarded Pueblo water rights on the basis of actual historical use.  *See New Mexico v. Aamodt*, 618 F.Supp. 993 (1985) ("*Aamodt II*").  The *Aamodt* District Court ruling included acreage irrigated in 1846 under the Mexican government and additional acreage brought under irrigation up until the enactment of the Pueblo Lands Act in 1924.  *Aamodt II*, 618 F.Supp. at 1010 ("The Pueblo aboriginal water right, as modified by Spanish and Mexican Law, included the right to irrigate new land in response to need").  The *Aamodt II* ruling was based upon the District Court's review of a Special Master's findings of

---

[2]Although New Mexico's Motion does not expressly state so, the context of its Memorandum in Support of its Motion for Partial Summary Judgment makes clear that this portion of the motion deals with those water rights associated with the Pueblos' grant lands as opposed to the lands held in trust for the Pueblos by the United States. Also, Section II of New Mexico's Reply, (Doc. No. 1951, filed June 23, 1988), is titled "Actual Historical Use is the Proper Measure of Pueblo Indian Water Rights on Grant Lands."

fact and conclusions of law on the rights of the Pueblos of San Ildefonso, Tesuque, Nambe and Pojaque. *See Aamodt II*, 618 F.Supp. at 996-1000.

Movant New Mexico failed to meet its initial burden of demonstrating the absence of genuine issues of material facts on this issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (party seeking summary judgment always bears initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact); *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (movant must show absence of genuine issue of material fact). New Mexico does not identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate that the findings and conclusions discussed in *Aamodt II* apply to the Pueblos of Jemez, Santa Ana and Zia in this case.

In the Treaty of Guadalupe Hidalgo, the United States promised to protect the rights and property of Mexicans then located in the ceded territory. However, the Treaty of Guadalupe Hidalgo does not specify what those property rights were under Mexican law. Without a clear understanding of what the Pueblos' property rights were under Mexican law, it is premature for the Court to rule that the proper quantification of the Pueblos' water rights is historical use. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970) (to prove that no genuine factual issues exist, movant must present a factual scenario without any unexplained gaps); *Aamodt I*, 537 F.2d at 1113 (quantification of the Pueblos' rights may require exploration of the pertinent law of Spain and Mexico).

Nor is it clear to the Court that the Pueblos' water rights on grant lands are limited to those

18

rights protected by the Treaty of Guadalupe Hidalgo.  The Pueblos and the United States may also acquire water rights in the same manner as any other public or private appropriator.  *See United States v. New Mexico*, 438 U.S. 696, 702 (1978) (Congress intended that the United States would acquire water for secondary purposes of a reservation in the same manner as any other public or private appropriator); *Farmers Dev. Co. v. Rayado Land & Irrigation Co.*, 213 P. 202, 207 (N.M. 1923) (where individual had initiated rights under general law and was prosecuting the same with diligence when New Mexico's 1907 Water Act went into effect, such right was recognized by and excluded from operation of the 1907 Act); *Reynolds v. Mendenhall*, 362 P.2d 998, 1004 (N.M.1961) (landowner who lawfully began developing underground water right and completed it with reasonable diligence acquired a water right with priority date as the initiation of his work even though the lands involved were placed within declared artesian basin before work was finished and water put to beneficial use).  Therefore, the Court will deny that portion of New Mexico's Motion seeking a ruling that the proper quantification for the water rights on the grant lands of the Pueblos of Jemez, Zia and Santa Ana is the actual, historical use by the Pueblos.

**Aboriginal Title as Basis for Ownership of Water Right**

New Mexico also seeks a ruling that aboriginal title is not a basis for property ownership of a water right.  New Mexico claims that aboriginal title, because it is a right of occupancy only, is not a property right to land and, therefore, cannot be the basis for an aboriginal title to a water right. New Mexico supports its argument using the following quote from Indian Claims Commission cases: "neither the Mexican nor Spanish governments at any time recognized that the Indians had 'aboriginal title' to these lands in the legal sense in which that term is used in our courts today."  *See, e.g., Pueblo de Zia v. United States*, 11 Ind. Cl. Comm. 131, 133 (1962).

19

While it does not provide Indians with fee-simple ownership of the land, aboriginal title, sometimes called "Indian title," refers to the right of Indians to occupy those lands that were occupied and used by them and their ancestors before the United States exercised sovereignty over those areas. *See Johnson v. M'Intosh*, 21 U.S. 543, 574, 585 (1823) (in the eastern part of the country, the United States, or the several states, obtained clear title, subject only to the Indian right of occupancy, to all the lands relinquished by Britain via the treaty that concluded the Revolutionary War). This is not a property right but amounts to a right of occupancy which the United States grants and protects against intrusion by third parties. *See Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955). However, the Indian right of occupancy is considered as sacred as the fee-simple of the whites and may only be extinguished by Congress. *See United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 345-347 (1941). Aboriginal title that is not recognized by subsequent treaty, statute, or agreement may be terminated by Congress without payment of just compensation. *See Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 284-285 (1955).

In addition to the right to occupancy of lands, aboriginal title includes the use of the waters and natural resources on those lands where the Indians hold aboriginal title. *See United States v. Winans*, 198 U.S. 371, 381 (1905) (treaty reserved to the Indians their pre-existing right to fish at all usual and accustomed places); *United States v. Adair*, 723 F.2d 1394, 1413-1414 (9th Cir. 1983), *cert. denied* 467 U.S. 1252 (1984) (tribe's aboriginal title included timber rights, aboriginal hunting and fishing rights, and water right to support its hunting and fishing lifestyle); *Joint Bd. of Control of Flathead, Mission and Jocko Irrigation Dist. v. United States*, 832 F.2d 1127, 1131 (9th Cir. 1987) (treaty preserved aboriginal fishing rights). The policy of respecting aboriginal rights applies to the lands ceded to the United States by Mexico in the Treaty of Guadalupe Hidalgo. *United States*

20

*v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 346 (1941); *Pueblos of Zia, Jemez and Santa Ana v. United States*, 165 Ct.Cl. 501 (1964) (Indian Claims Commission held that Pueblos could prosecute a valid claim based on aboriginal title to public lands despite the fact that the Pueblos had received valid Spanish grants of other parcels of land); *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1389 (Ct.Cl. 1975) (during the second half of the 19th century, the national policy of respecting unextinguished aboriginal title was in effect in New Mexico). Therefore, while aboriginal title is not a fee-simple property right, it can form the basis for ownership of a water right. *See New Mexico Prods. Co. v. New Mexico Power* Co., 77 P.2d 634, 641 (N.M. 1937) (a water right is real property). The Court will deny that portion of New Mexico's motion seeking a ruling that aboriginal title is not a basis for property ownership of a water right.

**Extent of Water Rights Conferred by Spanish and Mexican Law Apart from Actual Uses**

New Mexico seeks a ruling that neither the alleged Spanish and Mexican land grants to the Pueblos nor the operation of Spanish and Mexican law conferred a water right apart from actual uses. This portion of New Mexico's Motion essentially seeks a ruling on the quantification of the Pueblos' water rights. The Court addressed this issue earlier in this Opinion stating that without a clear understanding of what the Pueblos' property rights were under Mexican law, it is premature for the Court to rule that the proper quantification of the Pueblos' water rights is historical use. Therefore, the Court will deny that portion of New Mexico's Motion seeking a ruling that neither the alleged Spanish and Mexican land grants to the Pueblos nor operation of Spanish and Mexican law conferred a water right apart from actual uses.

***Winters* Doctrine Does Not Apply to Pueblo Grant Lands**

For the reasons that follow, the Court will grant that portion of New Mexico's motion seeking

a ruling that the *Winters* doctrine does not apply to Pueblo grant lands. *See Winters v. United States*, 207 U.S. 564 (1908). *Winters* rights arise from government reservations of land for Indians that establish new uses of water. *See* 4 Robert E. Beck, *Waters and Water Rights* § 37.02(a)(1) (1996) ("the defining characteristic of *Winters* rights is that they reserve water for new uses, as necessary to carry out the reservation's purposes"). Under the *Winters* doctrine, the government impliedly reserves sufficient water to accomplish the purposes of the reservation of land.

Initially, the Indians in the *Winters* case had the right to occupy and use a relatively large tract of land which was adequate for the habits and wants of the "nomadic and uncivilized people." *Winters v. United States*, 207 U.S. 564, 576 (1908). It was the policy of the government and the desire of the Indians, to change those habits and to become a pastoral and civilized people. *Id.* In an agreement with the United States, the Indians ceded all those lands they had the right to occupy and use, except for a small tract set apart as a reservation. *Id.* The land reserved was arid and practically valueless without irrigation. *Id.* The agreement between the Indians and the United States implied a reservation of water by the government for the purpose of giving the Indians the power to change from their old nomadic habits to new, agrarian habits. *Id.* at 577.

The Tenth Circuit has provided some guidance on the applicability of the *Winters* doctrine to the Pueblos water rights associated with the grant lands. *See New Mexico v. Aamodt*, 537 F.2d 1102, 1111 (10th Cir. 1976) ("*Aamodt I*"). The *Aamodt* case is a pending water rights adjudication, Civ. No. 66-6639 (D.N.M. filed April 20, 1966), which includes four Pueblos in northern New Mexico. The historical background of the *Aamodt* Pueblos is similar to that of the Pueblos in this case. *See Aamodt I*, 537 F.2d at 1105.

In *Aamodt I*, the Tenth Circuit stated that the *Winters* ruling recognizing reserved water rights

on reservations created by the United States is "not technically applicable" to Pueblo water rights.

*Aamodt I*, 537 F.2d at 1111.  This court agrees.  *See also Martinez v. Kerr-McGee Corp.*, 898 P.2d

1256, 1265 (N.M. Ct. App. 1995) (holding that *Winters* doctrine does not apply to Pueblo grant

lands).  The Tenth Circuit reasoned that

> "[t]he recognized fee title of the Pueblos is logically inconsistent with the concept of a reserved right.  By the Treaty of Guadalupe Hidalgo the United States agreed to protect rights recognized by the prior sovereigns.  Whatever those rights may have been, they were validated by the 1858 Act which confirmed the land claims of the [Aamodt] Pueblos and which said . . .'Provided, That this confirmation shall only be construed as a relinquishment of all title and claim of the United States of any of said lands' . . . A relinquishment of title by the United States differs from the creation of a reservation for the Indians.  In its relinquishment the United States reserved nothing."

*Aamodt I*, 537 F.2d at 1111.

The same reasoning applies to the Pueblos in this case.  *See also Aamodt I*, 537 F.2d at 1113 ("The

United States had nothing to reserve").

  The *Winters* case can be further distinguished from the case presently before the Court.  In

*Winters*, the primary purpose of the United States and the Indians in establishing the reservation was

to change the Indians' lifestyle from nomadic to agrarian.  Congress expressly stated that purpose in

the agreement with the Indians.  25 Stat. 113 (1888) ("Indians desirous . . . to obtain the means to

enable them to become self-supporting, as a pastoral and agricultural people").  This change in

lifestyle established a new use of water for which the United States impliedly reserved water for use

on land that the United States reserved from the public domain.

  In the case presently before Court, the United States did not enter into an agreement with the

Pueblo Indians, impliedly reserving water for new uses on land reserved from the public domain for

the use of Indians alone.  The Treaty of Guadalupe Hidalgo was an agreement between the United

States and Mexico in which the United States agreed to protect the property of Mexican citizens then in the ceded territory.  Mexican citizens included not only Indians, but Europeans and Africans.   As such, the Pueblos' grant lands had no different status under the Treaty than the grant lands owned by the non-Indian Mexicans.  The only "purpose" of the Treaty with respect to Mexican-owned property was to protect existing rights.  To protect property is not to grant property nor reserve additional property rights, but to maintain the *status quo*.  *See Boquillas Land & Cattle Co. v. Curtis*, 213 U.S. 339, 344 (1909) ("It is not to be understood that when the United States executes a document on the footing of an earlier grant by a former sovereign, it intends or purports to enlarge the grant.").

That the Treaty did not grant or reserve any additional rights is established by the two acts confirming the land titles of the three Pueblos.  Those acts contained a proviso that "the confirmation shall *only be construed as a relinquishment* of title on the part of the United States, and shall not affect any adverse valid right, should any such exist." 11 Stat. 374 (1859) (*emphasis added*); 15 Stat. 438 (1869).  In the cases of Zia and Jemez Pueblos, the act stated that the Commissioner of the Land Office "shall cause a patent to issue therefor *as in ordinary cases to private individuals.*"  11 Stat. 374 (1859) (*emphasis added*).

The Court will not rule that the United States impliedly reserved water rights when it confirmed the land titles of the Pueblos.  A confirmatory act of Congress is final as to the nature and validity of a Spanish land grant and is not subject to judicial review.  *See United States v. Tijerina,* 407 F.2d 349, n. 3 (10th Cir. 1969).  The language clearly states that the confirmation is solely a relinquishment of title by the United States. *See Blum v. Stenson*, 465 U.S. 886, 896 (1984) (where resolution of a question of federal law turns on a statute and the intention of Congress, the Court

looks first to the plain meaning of the statutory language and then to the legislative history if the statutory language is unclear); *American Tobacco Co. V. Patterson*, 456 U.S. 63, 68, 71 (1982) (where the language of the statute is unambiguous, it is presumed to reflect the intent of Congress and is therefore controlling).  The Court will not substitute language, thereby changing the law, where Congress has spoken clearly and unambiguously. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978) (the court's individual appraisal of the wisdom or unwisdom of a particular course consciously selected by Congress is to be put aside in the process of interpreting a statute); *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000) (when  the statute provides a clear answer, the court's analysis is at an end).

Nor did the extension of the Indian Trade and Intercourse Act over the Indians of New Mexico impliedly reserve any water rights above what the United States agreed to recognize in the Treaty of Guadalupe Hidalgo.  The Indian Trade and Intercourse Act is a generic enactment by Congress to protect Indians, including Pueblos, and does not establish the purposes of any reservation.  It was not the Indian Trade and Intercourse Act of 1834 that reserved water for various Indian tribes in the western United States, but individual treaties, congressional acts and executive orders.  *See, e.g., Winters*, 207 U.S. at 568 (agreement in 1888, Montana); *Adair*, 723 F.2d at 1397-1398 (1864 treaty, Oregon and California); *Arizona v. California* at 596, n. 98-100 (1865 act, executive orders and amendments from 1873 to 1917).

Some of the United States' and Pueblos' argument is that the *Winters* doctrine applies because the Pueblos retained, i.e. did not grant away, their aboriginal rights.  The Court's ruling that the *Winters* doctrine does not apply to grant lands simply means that the United States did not impliedly reserve water for new uses on the Pueblos' grant lands.  It does not mean that Pueblos do not have

25

aboriginal use rights on the grant lands.  The  issue of whether the Pueblos' aboriginal rights on their

grant lands have been extinguished was not raised in the State's Motion and will not be addressed at

this time.  *But see Pueblos de Zia, Jemez and Santa Ana v. United States*, 165 Ct.Cl. 501 (Ct.Cl.

1964) ("[The Pueblos of Zia, Jemez and Santa Ana] concede the correctness of the [Indian Claims]

Commission's determination that they have no aboriginal claim to Spanish grants which encroach on

the claimed area, since these grants were all held valid and patented by the United States, and hence

were private property as of the time of the Treaty [of Guadalupe Hidalgo]."

**Applicability of *Winans* Doctrine to Pueblo Grant Lands**

For the reasons that follow, the Court will deny that portion of New Mexico's motion seeking

a ruling that the *Winans* doctrine does not apply to Pueblo grant lands.  *Winans* rights essentially are

governmentally recognized aboriginal rights.  *See* 4 Robert E. Beck, *Waters and Water Rights*

§ 37.02(a)(2) (1996).  They preserve existing uses instead of establishing new uses.  *Id.*

*Winans* is one of the earliest cases to address reserved rights.  *See United States v. Winans*,

198 U.S. 371 (1905).  In a treaty between the United States and the Yakima Indians in the State of

Washington, the Indians relinquished and conveyed to the United States all their right, title and

interest in and to the lands occupied and claimed by them.  *Winans*, 198 U.S. at 377.  The Indians did,

however, reserve from the lands ceded a tract of land for their use and occupation.  *Id.*  The Indians

also reserved the right to take fish at all usual and accustomed places.  *Id.* at 378.  Some of the

Indians' usual and accustomed fishing places were outside the reservation on the Columbia River

where the land bordering the river was privately owned by non-Indians.  The patents issued to non-

Indians for those lands bordering on the Columbia River, though absolute in form, can grant no

exemption from the fishing rights secured to the Yakima Indians by the treaty.  *Id.* at 381-382.  "The

treaty was not a grant of rights to the Indians, but a grant of rights from them, a reservation of those not granted." *Id.* at 381.

*Winans* dealt with fishing rights, but the doctrine applies also to water rights. *See United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir. 1983) *cert. denied*, 467 U.S. 1252 (1984); *Joint Bd. of Control of the Flathead, Mission & Jocko Irrig. Dists. v. United States*, 832 F.2d 1127, 1131 (9th Cir. 1987) (to the extent that the Tribes here exercised aboriginal fishing rights, the treaty language clearly preserved those rights and the water needed for them with a priority date of time immemorial). In 1864, the Klamath Tribe entered into a treaty with the United States whereby it relinquished its aboriginal claim to some 12 million acres of land in return for a reservation of approximately 800,000 acres. *Adair*, 723 F.2d at 1397-1398. The treaty also gave the Klamath the exclusive right to hunt, fish and gather on their reservation. *Id.* at 1398. At the time the Klamath Reservation was established, the Tribe and the Government intended to reserve a quantity of the water flowing through the reservation for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands. *Id.* at 1410. The Tribe's uninterrupted use and occupation of land and water created in the Tribe aboriginal title to all of its vast holdings. *Id.* at 1413. The 1864 Treaty is a recognition of the Tribe's aboriginal water rights and a confirmation to the Tribe of a continued water right to support its hunting and fishing lifestyle on the Klamath Reservation. *Id.* at 1414. Such water rights necessarily carry a priority date of time immemorial. *Id.* at 1414. The rights were not created by the 1864 Treaty, rather, the treaty confirmed the continued existence of these rights. *Id.* at 1414. The treaty impliedly reserved an amount of water sufficient to support exercise of treaty hunting and fishing rights. *Id.* at 1414.

Applicability of the *Winans* doctrine to the Pueblos' grant lands will depend on whether there

27

has been governmental recognition of the Pueblos' aboriginal rights.  In *Winans* and *Adair* there was fairly specific language in the treaties between the Indians and the United States indicating that the government recognized their aboriginal rights.  Here there is no treaty or agreement between the Pueblos and the United States that fairly specifically recognizes the Pueblos' aboriginal rights.  There is, however, the Treaty of Guadalupe Hidalgo in which the United States agrees to protect, and thereby recognizes,  whatever rights the Pueblos had under the previous sovereign.  As discussed above, what the Pueblos' rights were under the previous sovereign have yet to be determined. Because New Mexico has not met its initial burden of demonstrating the absence of genuine issues of material facts, that portion of its Motion seeking a ruling that the *Winans* doctrine does not apply to Pueblo grant lands shall be denied.  The Parties will be allowed to raise the issue of the applicability of the *Winans* doctrine to Pueblo grant lands following discovery.

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants' Motion for Partial Summary Judgment (Doc. No. 1935, filed June 9, 1988) is very vague stating only that the Defendants "move the Court to grant them partial summary judgment on all claims of "reserved" rights asserted by the Pueblos and all other claims for water in excess of what they were using in 1933 or have subsequently acquired valid rights to use subsequent to 1933." Based upon Defendants' Brief in Support of Motion for Summary Judgment (Doc. No. 1937, filed June 9, 1988; "Defs' Brief"), the Court understands that Defendants seek the following rulings:

1.      The Pueblos' claim of "federally reserved rights" on grant lands must fail because nothing was granted, (Defs' Brief at 4);

2.a.    The "trust" lands were not reserved for agricultural purposes, (Defs' Brief at 17);

2b.     The priority of any "reserved rights" are the dates those lands were placed in trust,

28

(Defs' Brief at 19);

       3.      To the extent that an "Indian reserved" water right exists, the unique history and legal status of the Pueblos renders it inapplicable, (Defs' Brief at 20); and,

       4.      Congress rejected any form of "reserved rights" in the 1924 and 1933 Acts, (Defs' Brief at 42).

**Federally Reserved Rights on Grant Lands**

Earlier in this Opinion, the Court ruled on the applicability of the *Winters* and *Winans* reserved-rights doctrines to Pueblo grant lands.  Therefore, the Court will deny as moot that portion of Defendants' Motion Defendants seeking a ruling that "the Pueblos' claim of 'federally reserved rights' on grant lands must fail because nothing was granted."

**Purposes of Trust Lands**

Defendants seek a ruling that the trust lands were not reserved for agricultural purposes. Legislative intent is a factual question.  *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).  And, the purpose of the legislation placing the land in trust is material because it will be a factor in quantifying the amount of water, if any, reserved. Defendants attempt to demonstrate that there is no genuine issue regarding the purposes of the trust lands by essentially showing that none of the legislation establishing the reservations uses the word "agriculture" or "cultivation."   However, some of the legislation contains phrases such as "for the benefit and use of the Pueblos."  *See, e.g.,* 43 Stat. 92 (1924); *but see* 100 Stat. 3354 (1986) ("Nothing in this Act shall be construed to create or affect any water rights other than those that are appurtenant to such lands under State law on the day before the date of enactment of this Act").  The question then becomes whether those phrases include or exclude "agriculture."   It is not the Court's function at summary judgment stage to determine the

truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  And, the Court must draw all justifiable inferences in favor of the non-movant.  *Id.* at 255.  "Agriculture" is "[t]he science or art of cultivating the soil, harvesting crops, and raising livestock."  BLACK'S LAW DICTIONARY 68 (6th ed. 1990).  Because "for the benefit and use of the Pueblo" might include agricultural uses, including grazing, the Court will deny that portion of Defendants' Motion seeking a ruling that the trust lands were not reserved for agricultural purposes.

**Priority of Reserved Rights**

The Court will grant in part and deny in part that portion of Defendant's Motion seeking a ruling that the priority of any "reserved rights" are the dates those lands were placed in trust.  The Court will grant Defendants' Motion with respect to those water rights reserved by the federal government under the "implied reservation of water doctrine."  *See Winters*, 207 U.S. 564, 577 (1908);  *Cappaert v. United States*, 426 U.S. 128, 138 (1976).  When the federal government withdraws its land from the public domain and reserves it for a federal purpose, the government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation, and in so doing, acquires a reserved right which vests on the date of the reservation.  *Cappaert*, 426 U.S. at 138.  The doctrine applies to Indian reservations.  *Id.*  The priority date of any reserved rights on the trust lands that the United States acquired is the date that the trust lands were reserved.  *See Arizona v. California*, 373 U.S. 546, 600 (1963) (United States reserved water rights for Indian reservations effective as of the time the Indian reservations were created).

The Court will deny Defendants' Motion to the extent it seeks such a ruling on any rights

30

reserved by the Pueblos.  As discussed earlier, Indians may in some cases reserve aboriginal rights.
*See United States v. Winans*, 198 U.S. 371, 381 (1905); *United States v. Adair*, 723 F.2d 1394, 1414
(9th Cir. 1983);  *Joint Bd. of Control of the Flathead, Mission & Jocko Irrig. Dists. v. United States*,
832 F.2d 1127, 1131 (9th Cir. 1987).  Such water rights carry a priority date of time immemorial.
*See Adair*, 723 F.2d at 1414.

**Effect of Unique History and Legal Status of Pueblos on Reserved Rights**

Defendants' Motion seeks a ruling that "to the extent that an 'Indian reserved' water right
exists, the unique history and legal status of the Pueblos renders it inapplicable."  To support their
motion, Defendants argue that as a result of their unique history, the Pueblos were not considered
"Indian tribes" under the Non-Intercourse Acts, enjoyed no special status until after New Mexico
statehood, and, therefore, their water rights were governed by the doctrine of prior appropriation
until 1933.  Defendants rely on a 1985 Supreme Court case construing a section of the 1924 Pueblo
Lands Act.  *See Mountain States Telephone and Telegraph Co. v. Pueblo of Santa Ana*, 472 U.S.
237 (1985).

Defendants highlight portions of *Mountain States* where it states "in [the United States
Supreme Court's] view, it is much more likely that Congress intended to authorize a different
procedure for Pueblo lands in view of their unique history . . . Congress surely wanted to make clear
that state law, for the future, was entirely pre-empted in this area."  *See Mountain States*, 472 U.S.
at 251-252.  Defendants contend that *Mountain States* stands for the proposition that prior to
enactment of the Pueblo Lands Act, Pueblo water rights acquisition was governed by state law.  The
Court disagrees for several reasons.

First, *Mountain States* construes a section of the 1924 Pueblo Lands Act which controls

future, i.e. post-1924, land conveyances by the Pueblos.  *See Mountain States*, 472 U.S. at 246.

*Mountain States* does not hold that state law controlled water rights acquisitions by the Pueblos prior

to 1924.   Second, *Mountain States* refers to the 1924 Pueblo Lands Act as "special remedial

legislation" which was "designed to settle the consequences of past transactions."  *Mountain States*,

472 U.S. at 240, 246.  Such language suggests that the *Mountain States* court believed that the Non-

Intercourse Act applied to the Pueblos prior to 1924.  Finally, as discussed above, the United States

Supreme Court has stated that the Pueblos are Indians and that the provision in the 1834 Indian Trade

and Intercourse Act prohibiting the alienation of Pueblo property without government supervision,

includes the Pueblo Indians.  *See United States v. Sandoval*, 231 U.S. 28, 47-49 (1913) (the United

States Supreme Court's earlier case, *Joseph*, which ruled that Pueblos are not Indians, "cannot be

regarded as holding that [the Pueblos] or their lands are beyond the range of congressional power

under the Constitution");  *United States v. Candelaria*, 271 U.S. 432, 441 (1926).  Therefore, the

Court will deny that portion of Defendants' Motion seeking a ruling that "to the extent that an 'Indian

reserved' water right exists, the unique history and legal status of the Pueblos renders it inapplicable."

**Effect of 1924 and 1933 Pueblo Lands Act on Reserved Rights on Grant Lands**

Defendants seek a ruling that "Congress rejected any form of reserved rights in the 1924 and

1933 Acts."  Defendants state that "[a]s shown in [Defendants' historian/expert's affidavit], nothing

indicates recognition of any type of 'reserved right' on the Pueblos [sic] grant lands from 1847-1924

. . .[as such, the] only place left to look for either the creation or recognition of such a right on the

Pueblos' grant lands are the 1924 and 1933 [Pueblo Lands] Acts." (Defs' Brief in Support of Motion

for Partial Summary Judgment at 42, Doc. No. 1937, filed June 9, 1988).  Defendants argue that not

only do the Acts fail to expressly create or recognize reserved rights, but in addition, the legislative

history of the Acts show that Congress considered, and rejected, the proposition that the Pueblos held reserved rights.

The 1924 and 1933 Pueblo Lands Acts do not expressly address "reserved rights." The 1924 Pueblo Lands Act directed the Pueblo Lands Board to report on "the extent, source, and character of *any* water right appurtenant to [land within the Pueblo grant boundaries in possession of non-Indian claimants]." 43 Stat. at 637 (*emphasis added*). Section 9 of the 1933 Pueblo Lands Act states "Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water . . . ." 48 Stat. at 111. Elsewhere in the 1924 and 1933 Acts Congress uses the terms "water rights," "said water rights," and "such water rights" without specifying the legal basis of the rights.

Both Movants and Non-Movants support their respective positions, on Congress' intent with regard to the Pueblos' reserved water rights in enacting the 1924 and 1933 Pueblo Lands Acts, by citing the legislative history of the Acts. The Court concludes that there is a genuine issue of material fact with respect to the effect of the 1924 and 1933 Pueblo Lands Acts on the Pueblos' reserved rights, if any. *See Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (legislative intent is a factual question); *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986) (court's function at summary judgment stage is to determine whether there is a genuine issue for trial, not to determine the truth of the matter).

## SPECIAL MASTER'S REPORT ON PUEBLOS' HISTORICAL AND EXISTING USE CLAIMS

The Special Master filed a second report containing recommended "determinations [of] the claims asserted by the United States for the Pueblos, and by the Pueblos for themselves, to water

rights based upon the Pueblos' present and past uses of water." (Doc. No. 2291, filed October 1, 1991). The Special Master's recommendations include, among other things, quantities and priority dates. The quantity and priority date of each water right will depend on the legal basis of the water right, i.e. aboriginal, Indian reserved/*Winans*, federally reserved/*Winters*, Treaty of Guadalupe Hidalgo, or appropriation under state law. Because the legal bases for the Pueblos' water rights have yet to be fully resolved, it is premature at this time to act on the Special Master's Report on Historical and Existing Use Claims (Doc. No. 2291, filed October 1, 1991).

**IT IS THEREFORE ORDERED:**

(1)    The United States' and Pueblos' of Jemez, Santa Ana and Zia Motion for Action on Special Master's Report, (Doc. No. 1999, filed October 19, 1988), is **GRANTED.**

(2)    Defendants' Motion for Action on Defendants' Objection to the Special Master's Report, (Doc. No. 2000, filed October 24, 1988), is **GRANTED.**

(3)    New Mexico's Motion for Partial Summary Judgment, (Doc. No. 1938, filed June 9, 1988), is **GRANTED IN PART** and **DENIED IN PART** as follows:

(a)    That portion of New Mexico's Motion seeking a ruling that the proper quantification for the water rights of the Pueblos of Jemez, Zia and Santa Ana is the actual, historical use by the Pueblos, is **DENIED;**

(b)    That portion of New Mexico's Motion seeking a ruling that aboriginal title is not a basis for property ownership of a water right, is **DENIED;**

(c)    That portion of New Mexico's Motion seeking a ruling that neither the alleged grants to the Pueblos nor operation of Spanish and Mexican law conferred a water right apart from actual uses, is **DENIED;**

34

(d)     That portion of New Mexico's Motion seeking a ruling that the *Winters* Doctrine does not apply to Pueblo grant lands, is **GRANTED;**

(e)     That portion of New Mexico's Motion seeking a ruling that *Winans* treaty rights do not apply to the Pueblos' grant lands, is **DENIED;**

(4)     Defendants' Motion for Partial Summary Judgment, (Doc. No. 1935, filed June 9, 1988), is **GRANTED IN PART** and **DENIED IN PART** as follows:

(a)     That portion of Defendants' Motion seeking a ruling that the Pueblos' claim of "federally reserved rights" on grant lands must fail because nothing was granted, is **DENIED AS MOOT;**

(b)     That portion of Defendants' Motion seeking a ruling that the trust lands were not reserved for agricultural purposes, is **DENIED;**

(c)     That portion of Defendants' Motion seeking a ruling that the priority of any reserved rights are the dates those lands were placed in trust, is **GRANTED** with respect to water rights reserved by the federal government under the implied reservation of water doctrine, and **DENIED** with respect to any rights reserved by the Pueblos;

(d)     That portion of Defendants' Motion seeking a ruling that to the extent that an "Indian reserved" water right exists, the unique history and legal status of the Pueblos renders it inapplicable, is **DENIED;** and,

(e)     That portion of Defendants' Motion seeking a ruling that Congress rejected any form of "reserved rights" in the 1924 and 1933 Acts, is **DENIED.**

(5)     The Special Master's Report on the Pueblos' Future Use Claims, (Doc. No. 1980,

35

filed September 14, 1988), is **REJECTED AS MOOT.**

(6)     Defendants' Objection to "Report of Special Master," (Doc. No. 1985, filed September 28, 1988), is **OVERRULED AS MOOT.**

(7)     The Objection of the United States and the Pueblos of Jemez, Zia, and Santa Ana to the Report of the Special Master, (Doc. No. 1986, filed September 29, 1988) is **OVERRULED AS MOOT.**

_____

**MARTHA VÁZQUEZ**
**CHIEF UNITED STATES DISTRICT JUDGE**