# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, on its
own behalf and on behalf of the
PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,

and

STATE OF NEW MEXICO, *ex rel.*
State Engineer,
        Plaintiffs,                        83cv01041 MV/WPL
                                                         JEMEZ RIVER ADJUDICATION
and

THE PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,
        Plaintiffs-in-Intervention,

v.

TOM ABOUSLEMAN, *et al.*,
        Defendants.

## MEMORANDUM OPINION AND ORDER OVERRULING OBJECTIONS TO PROPOSED FINDINGS AND RECOMMENDED DISPOSITION REGARDING ISSUES 1 AND 2

**THIS MATTER** comes before the Court on the Objections of Intervenors Pueblo of Santa Ana and Pueblo of Jemez to Proposed Findings and Recommended Disposition Regarding Issues 1 and 2, Doc. 4384, filed November 1, 2016 ("Pueblos' Objections"), and on the United States' Objections to Proposed Findings and Recommended Disposition Regarding Issues 1 and 2, Doc. 4385, filed November 1, 2016 ("United States' Objections).[1]  For the reasons stated below, the Court will **OVERRULE** the Objections and **ADOPT** United States Magistrate Judge William P. Lynch's Proposed Findings and Recommended Disposition Regarding Issues 1 and 2, Doc. 4383

---

[1] Intervenor Pueblo of Zia concurs and joins with Objections submitted by the United States and the Pueblos of Jemez and Santa Ana.  *See* Doc. 4386, filed November 1, 2016.

("PFRD").

The parties requested that the Court rule on the following legal issues before proceeding with the adjudication of the Pueblos' water rights claims:

Issue No. 1: Have the Pueblos ever possessed aboriginal water rights in connection with their grant or trust lands, and if so, have those aboriginal water rights been modified or extinguished in any way by any actions of Spain, Mexico or the United States?

    Sub-issue: Did the Acts of 1866, 1870 and 1877 have any effect on the Pueblos' water rights and, if so, what effect?

    Sub-issue: Did the Pueblo Lands Acts of 1924 and 1933 have any effect on the Pueblos' water rights and, if so, what effect?

    Sub-issue: Did the Indian Claims Commission Act have any effect on the Pueblos' water rights and, if so, what effect?

Issue No. 2: Does the *Winans* doctrine apply to any of the Pueblos' grant or trust lands?

Doc. 4363 at 2. "Aboriginal title denotes an interest that an Indian tribe possesses in land . . . [and] is not a property right but amounts to a right of occupancy which the sovereign grants and protects against by intrusion by third parties . . .[and] includes the use of the waters and natural resources on those lands where the Indians hold aboriginal title." PFRD at 2-3 (citations omitted). "*Winans* rights essentially are recognized aboriginal rights." PFRD at 13 (citation omitted).

In addressing Issue No. 1, its sub-issues and Issue No. 2, United States Magistrate Judge William P. Lynch considered the briefs of the parties, the testimony and expert reports of the expert witness for the United States and Pueblos, Charles R. Cutter, Ph.D., and the expert witness for the State, Professor G. Emlen Hall, and relevant law. *See* PFRD at 2. Judge Lynch

2

concluded:

> I recommend that the Court find that the Pueblos of Jemez, Santa Ana, and Zia actually and exclusively used water continuously for a long time before the Spanish occupation of New Mexico, and thus conclude that the Pueblos possessed aboriginal water rights in connection with their grant or trust lands prior to the arrival of the Spanish. Further, I recommend that the Court find that Spain imposed a legal system to administer the use of public waters which extinguished the Pueblos' right to increase their use of public water without restriction, and that Spain's exercise of complete dominion over the use of public waters extinguished the Pueblos' aboriginal water rights. Finally, I recommend that the Court conclude that the *Winans* doctrine does not apply to any of the Pueblos' grant or trust lands.

PFRD at 14.

The United States and the Pueblos object to Judge Lynch's findings and conclusion that Spain extinguished the Pueblos' aboriginal water rights. *See* Pueblos' Objections at 21-22; United States' Objections at 24-25.

In concluding that Spain extinguished the Pueblos' aboriginal water rights, Judge Lynch stated:

> "*Santa Fe Pacific* indicates that Indian title can be extinguished in a number of ways including 'by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise.' 314 U.S. at 347. The Supreme Court more recently has indicated that 'Congressional intent to authorize the extinguishment of Indian title must by 'plain and unambiguous,'—that is, it either 'must be expressed on the face of the Act *or be clear from the surrounding circumstance and legislative history.'*" . . . . I find that Spain imposed a legal system to administer the use of public waters and that regalía[2] ended the Pueblos' exclusive use of the public waters and subjected the Pueblos' later use of public waters to potential repartimientos.[3] Such a system is a plain and unambiguous

---

[2] "'Regalía' refers to the right of 'the Crown [to exercise] supreme power over the administration, licensing, and adjudication of certain spheres of activity and kinds of resources.'" PFRD at 6.

[3] "One way the crown could resolve conflicts and allocate rights to public waters was through the process of 'repartimiento.'" PFRD at 8. "A *repartimiento* was a quasi-judicial and administrative proceeding in which government officials applied controlling principles of equitable distribution to apportion available water supplies." *New Mexico v. Aamodt*, 618 F.Supp. 993, 998 (D.N.M. 1985) (Mechem, S.J.).

indication that the Spanish crown extinguished the Pueblos' right to increase their use of public water without restriction and as such is an exercise of complete dominion adverse to the Pueblos' aboriginal right to use water.

PFRD at 12-13 (*emphasis in original*).[4]

The United States and the Pueblos do not dispute that the sovereign can extinguish aboriginal title in a number of ways including "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." *See United States v. Santa Fe Pacific R. Co. R. Co.*, 314 U.S. 339, 347 (1941); Pueblos' Objections at 4 (stating *Santa Fe Pacific* "is unquestionably the leading authority in Supreme Court jurisprudence on the subject of Indian aboriginal title"); United States' Objections at 5 (stating Judge Lynch "correctly noted" the ways a sovereign can extinguish aboriginal title) (quoting *Santa Fe Pacific*). The United States and Pueblos contend that the mere imposition of Spanish sovereignty was insufficient to extinguish the Pueblos' aboriginal water rights.

The United States and Pueblos argue that there was no affirmative act by Spain, such as a repartimiento, which shows plain and unambiguous intent to extinguish the Pueblos' aboriginal water rights. *See* United States' Objections at 6; Pueblos' Objections at 7-12. The Pueblos argue that "[i]f the mere imposition of a controlling legal regime, with no affirmative act adverse to Indian aboriginal rights, were nonetheless deemed to extinguish those rights, no aboriginal rights to land or water would have existed in the area of the Mexican cession at all. They would all have

---

4 Extinguishment of the Pueblos' aboriginal water rights does not mean the Pueblos have no right to use the waters of the Jemez River stream system. When Mexico took over sovereignty from Spain by virtue of the Treaty of Cordova on August 21, 1821, the Mexican government affirmed that it would protect the property of all the inhabitants of New Spain. In the Treaty of Guadalupe Hidalgo of 1848, in which Mexico ceded the area to the United States, the United States agreed to protect rights recognized by prior sovereigns. *See* PFRD at 8-9.

been extinguished upon the establishment of Spanish control of the area." Pueblos' Objections at 7-8.

The United States and the Pueblos presented a similar argument to Judge Lynch who was not persuaded and stated: "According [to] the US/Pueblos' expert, Dr. Cutter, under Spanish and Mexican law, rights to land were separate from rights to water, and the Spanish and Mexican governments held the power to determine rights to public waters." PFRD at 13. Dr. Cutter testified that "the surface interest of land was a separate interest under Spanish and Mexican law from the mineral interests and from the interest in common public water sources." PFRD at 7 (quoting Dr. Cutter). Based on Dr. Cutter's statements, Judge Lynch concluded: "Thus, the Spanish government appears to have recognized aboriginal title to land, but did not recognize aboriginal title to the use of water." PFRD at 13. Judge Lynch also considered Dr. Cutter's statements in concluding that Spain's legal system was "a plain and unambiguous indication that the Spanish crown extinguished the Pueblos' right to increase their use of public water without restriction and as such is an exercise of complete dominion adverse to the Pueblos' aboriginal right to use water." PFRD at 13. "The Spanish crown insisted on its prerogative [exclusive right and power], or regalía, in matters pertaining to land, water, and other resources, but this regalía did not apply to properties owned by Indians." PFRD at 5-6 (quoting Dr. Cutter). The crown's "regalía included the power to determine the rights to public shared water" and "[t]he crown reserved the right to allocate access to public shared waters." PFRD at 7 (quoting Dr. Cutter).

Having reviewed the testimony and expert reports of the expert witness for the United States and Pueblos, Charles R. Cutter, Ph.D., and the expert witness for the State, Professor G. Emlen Hall, the Court will overrule the objections of the United States and the Pueblos, and

adopt United States Magistrate Judge William P. Lynch's Proposed Findings and Recommended Disposition Regarding Issues 1 and 2.

According to the expert witness for the United States and Pueblos, Spain claimed its prerogative to "administrat[e], licens[e] and adjudicat[e] certain spheres of activity and kinds of resources," including "lands, fields, woodlands, pasturage, rivers and public waters." Cutter Report at 38. Although Spain recognized the Pueblos' pre-Spanish use of water and allowed the Pueblos to continue to use water,[5] Spain insisted on its exclusive right and power to determine the rights to public shared waters. *See* PFRD at 5-6 (quoting Dr. Cutter). Dr. Cutter agreed that Spain retained an interest in the use of all public waters sufficient to allow it "to adjust and readjust access" to public waters according to a complex list of factors, none of which was absolute and all of which applied simultaneously. Transcript at 128:3-17. Dr. Cutter stated that in Spanish civil and water law there was a general principle of no harm to other users and that under Spanish law the Pueblos did not have a right to expand their use of water if it were to the detriment of others. Transcript at 111-115, 138-139. According to Dr. Cutter, provisions in the *Recopilación de Indias*[6] provided that the woods, pastures, and waters were to be common to both the Spaniards and the Indians, and that the "rivers were to be used by everyone." Transcript at 168:19-169:2.

Prior to the arrival of the Spanish, the Pueblos were able to increase their use of public

---

[5] The State's expert, G. Emlen Hall, testified that the phrase "aboriginal title" does not appear anywhere in Spanish or Mexican law. Transcript at 284:22-285:1. *See also Pueblo de Zia v. United States*, 11 Ind. Cl. Comm. 131, 133 (1962) ("neither the Mexican nor Spanish governments at any time recognized that the Indians had 'aboriginal title' to these lands in the legal sense in which that term is used in our courts today).".
[6] The *Recopilación de Indias* is a compilation of the laws pertaining to Spain's overseas empires and was first published in 1681. Cutter Report at 6.

waters without restriction. After its arrival, the Spanish crown insisted on its exclusive right and power to determine the rights to public shared waters. Spanish law plainly provided that the waters were to be common to both the Spaniards and the Pueblos, and that the Pueblos did not have the right to expand their use of water if it were to the detriment of others. Although Spain allowed the Pueblos to continue their use of water, and did not take any affirmative act to decrease the amount of water the Pueblos were using, the circumstances cited by the expert for the United States and Pueblos plainly and unambiguously indicate Spain's intent to extinguish the Pueblos' right to increase their use of public waters without restriction and that Spain exercised complete dominion over the determination of the right to use public waters adverse to the Pueblos' pre-Spanish aboriginal right to use water. The Court will, therefore, overrule the Objections and adopt United States Magistrate Judge William P. Lynch's Proposed Findings and Recommended Disposition Regarding Issues 1 and 2, Doc. 4383.

**IT IS SO ORDERED.**

**MARTHA VAZQUEZ**
**UNITED STATES DISTRICT JUDGE**