# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, on its
own behalf and on behalf of the
PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,

and

STATE OF NEW MEXICO, *ex rel.*
State Engineer,

             Plaintiffs,                                No. 6:83-cv-01041-KWR-JMR
                                                  <u>JEMEZ RIVER ADJUDICATION</u>

and

THE PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,

             Plaintiffs-in-Intervention,

v.

TOM ABOUSLEMAN, *et al.*,

             Defendants.

## <u>MEMORANDUM OPINION AND ORDER REGARDING ISSUES 1 AND 2</u>

Plaintiffs seek an adjudication of the rights to the use of waters of the Jemez River stream

system. *See* N.M. Stat. Ann. § 72-4-19 (upon adjudication of the water rights, a decree shall be

prepared which declares, "as to the water right adjudged to each party, the priority, amount,

purpose, periods and place of use, and as to water used for irrigation, except as otherwise

provided in this article, the specific tracts of land to which it shall be appurtenant, together with

such other conditions as may be necessary to define the right and its priority").

This case was stayed for about five years, from 2007 until early in 2012, while the United

States, the Pueblos of Jemez, Santa Ana and Zia, the State of New Mexico and the Jemez River

Basin Water Users Coalition ("Coalition") (collectively "the Parties") pursued settlement negotiations.  The Parties returned to litigation after the negotiations broke down in 2012.  The Parties identified five threshold legal issues to be addressed before the Court could determine the Pueblos' water rights:

Issue No. 1:   Have the Pueblos ever possessed aboriginal water rights in connection with their grant or trust lands, and if so, have those aboriginal water rights been modified or extinguished in any way by any actions of Spain, Mexico or the United States?

    Sub-issue:   Did the Acts of 1866, 1870 and 1877 have any effect on the Pueblos' water rights and, if so, what effect?

    Sub-issue:   Did the Pueblo Lands Acts of 1924 and 1933 have any effect on the Pueblos' water rights and, if so, what effect?

    Sub-issue:   Did the Indian Claims Commission Act have any effect on the Pueblos' water rights and, if so, what effect?

Issue No. 2:   Does the *Winans* doctrine[1] apply to any of the Pueblos' grant or trust lands?

Issue No. 3:   If the Pueblos have aboriginal water rights or *Winans* reserved water rights, what standards apply to quantify such rights?

Issue No. 4:   Do the Pueblos have *Winters* reserved rights[2] appurtenant to their trust lands and, if so, how are those rights to be measured?

---

[1] The Winans doctrine is discussed below.

[2] *Winters* reserved rights refer to the water rights arising under the implied reservation doctrine first announced in *Winters v. United States*, 207 U.S. 564 (1908).

> *Winters* rights spring from government reservations of land for Indians.  The scope and nature of *Winters* rights are a function of the purposes of the reservation.    These purposes are usually the government's--especially for reservations established after 1871, when the government declined to enter into bilateral treaties, because the defining characteristic of *Winters* rights is that they reserve water for new uses, as reserving land for the Indians was to make the "nomadic and uncivilized" tribes into pastoral agrarians.  Fulfilling this goal required water.  The *Winters* doctrine supplied the necessary water through the

Issue No. 5:    Are the Pueblos entitled to any riparian rights?[3]

Doc. 4237 at 2-3, filed April 13, 2012; Doc. 4239 at 2-3, filed April 13, 2012.

After a three-day evidentiary hearing, United States Magistrate Judge William P. Lynch having considered the briefs of the parties, the testimony and expert reports of the expert witness for the United States and Pueblos, Charles R. Cutter, Ph.D., and the expert witness for the State, Professor G. Emlen Hall, and relevant law, entered his Proposed Findings and Recommended Disposition Regarding Issues 1 and 2 recommending that "the Court find that the Pueblos possessed aboriginal water rights prior to the Spanish occupation of New Mexico, but conclude that the Spanish crown exercised complete dominion and control over New Mexico in a manner adverse to the Pueblos and thus extinguished the Pueblos' aboriginal water rights."  Doc. 4383 at 1, filed October 4, 2016.

United States District Judge Martha Vázquez adopted the Judge Lynch's findings and recommendations regarding Issue No. 1 stating that the Spanish crown extinguished the Pueblos' aboriginal rights by exercising complete dominion over the determination of the right to use public waters and intended to extinguish the Pueblos' right to increase their use of public waters without restriction.  *See* Doc. 4397, filed September 30, 2017.  Judge Vázquez later granted the Pueblos' and the United States' motions to certify the Court's September 30, 2017, Order for interlocutory appeal.  *See* Doc. 4421, filed September 11, 2018.  In December 2020, the Tenth

government's implied intent to reserve, along with the arid land, sufficient water to transform the Indians from hunters and gatherers into farmers.

2 Waters and Water Rights § 37.02(a)(1) (3d ed. 2011).

[3] The United States and the Pueblos later indicated they are not asserting that the Pueblos are entitled to riparian rights.  *See* Mem. Op. and Order at 3, Doc. 4293, filed December 20, 2012 (stating the Court will not determine whether the Pueblos are entitled to riparian rights).

Circuit Court of Appeals reversed the Court's determination regarding Issue No. 1.  *See* Mandate, Doc. 4429, filed December 28, 2020.

The Court ordered the Parties to file briefs regarding the schedule for addressing the issues remaining due to the Tenth Circuit's decision.  *See* Doc. 4441, filed June 2, 2021.  The Pueblos of Jemez and Zia, the United States, the State of New Mexico and the Jemez River Basin Water Users Coalition ("Coalition") stated they had been in settlement negotiations for several years, have achieved substantial progress, believe it would be counterproductive to settlement efforts to prepare legal briefs during negotiations and expected that they can complete a settlement document by early 2022 for submission to New Mexico's Congressional delegation for introduction in the first half of 2022.  The Court granted a stay of litigation until February 22, 2022, with initial supplemental briefs due on March 1, 2022.  *See* Doc. 4452, filed October 28, 2021.  The Court later extended the stay and reset supplemental briefing on Issues No. 1 and No. 2 to be completed in November 2022.  *See* Doc. 4470, filed June 3, 2022.

In its opening supplemental brief on Issues 1 and 2, the Pueblo of Santa Ana notified the Court that:

> The Pueblos of Jemez and Zia have negotiated a settlement of their claims, that must be approved by Congress, and they have entered into an agreement with the State and the non-Indian Coalition that they would not seek to change their positions in the settlement, regardless of the outcome of this case.  They are thus not participating actively in this phase of this proceeding.

Doc. 4475 at 1, n.1, filed September 7, 2022.

### THE TENTH CIRCUIT'S DECISION

The Tenth Circuit began by providing an overview of Spanish sovereignty:

Spain arrived in the Jemez River Basin in 1598, bringing with it its concept of regalía, the royal prerogative. This was "the political theory of the colonial period

4

... that held that the crown exercised supreme power over the administration, licensing, and adjudication of certain spheres of activity and kinds of resources." (App'x 382.) The natural resources that fell within the Spanish crown's regalía "included lands, fields, woodlands, pasturage, rivers, and public waters," which were known as "realengas." (Id.) As to the realengas, the crown could "grant, with whatever limitation it might deem to be convenient, private or communal domain to individuals, towns and villages." (Id. 383.) "It bears noting, too, that while the crown insisted in principle on the right of regalía to intervene judicially to allocate water, it did not always do so, especially when there existed no conflict that required adjudication." (Id.) The crown bestowed its prerogative to local authorities "to oversee the distribution of unused or unoccupied lands and other resources in the New World." (Id.) The direction given to local authorities in the distribution of the realengas "typically called for Indian property and resources to be respected." (Id.)

....

It was within Spain's regalía, "that is the prerogative of the crown, to ensure effective use of water. That didn't mean that it always exercised its prerogative, but it did have that prerogative." (Id. 617.) There were two main principles guiding Spain's control of water. First, public waters were held in common and shared by everyone. (Id. 631.) Second, "one could not use public waters to the detriment of other users." (Id. 632.) Spain ensured the effective use of water in a number of ways, including a process called a "repartimiento de aguas," similar in concept to the water adjudication underlying this appeal. (Id. 329.) "The repartimiento de aguas might take several forms, and it occurred only when there was more than one user of a source of water." (Id.) Without conflict, a formal repartimiento would not take place; "[s]uch was the situation in the Jemez Valley watershed with respect to the Pueblos of Jemez, Zia, and Santa Ana." (Id.)

When a repartimiento was undertaken, a government official would apply six factors to each party claiming water—(1) prior use, (2) need, (3) purpose of use, (4) legal rights, (5) injury to third parties, and (6) equity and the common good—and then allocate the water accordingly. (Id. 636.) ... "No repartimientos of water were ever made by Spanish or Mexican authorities regarding the Jemez Valley waters used by Jemez, Zia, and Santa Ana. Thus, the governments of Spain and Mexico took no action to intervene in the uses that these Pueblos made of their water supply; nor did Spain or Mexico act to reduce or modify such use." (Id. 395.)

*United States v. Abouselman*,[4] 976 F.3d 1146, 1154-55 (2020).

---

[4] "The correct spelling is 'Abousleman.'" New Mexico's Response at 2 n.1, Doc. 4485, filed

The Tenth Circuit also provided an overview of aboriginal title:

Aboriginal title "refers to land claimed by a tribe by virtue of its possession and exercise of sovereignty rather than by virtue of letters of patent or any formal conveyance." 1 Cohen's Handbook of Federal Indian Law § 15.04 (2019). The concept of aboriginal title, sometimes called "Indian title" or "native title," comes from a recognition that the property rights of indigenous people persist even after another sovereign assumes authority over the land. *See Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768, 784 (1993). Aboriginal title was recognized by all European sovereigns and the United States, and "is considered as sacred as the fee simple of the whites." *Mitchel v. United States*, 34 U.S. 9 Pet. 711, 746, 9 L.Ed. 283 (1835); *see Johnson & Graham's Lessee v. M'Intosh*, 21 U.S. 8 Wheat. 543, 574, 5 L.Ed. 681 (1823).

Whether a tribe had aboriginal title is a question of fact; a tribe must prove that it had "actual, exclusive and continuous use and occupancy for a long time." *Uintah Ute Indians of Utah*, 28 Fed. Cl. at 784. Once established, however, aboriginal title remains until it is extinguished, and "[a]s against any but the sovereign, original Indian title was accorded the protection of complete ownership." *United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 46, 67 S.Ct. 167, 91 L.Ed. 29 (1946).

....

Extinguishing aboriginal rights is complicated; aboriginal rights can only be extinguished by the sovereign. *See Oneida Indian Nation v. Cty. of Oneida* ("*Oneida I*"), 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). A sovereign can extinguish aboriginal title "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." *Santa Fe Pac. R.R. Co.*, 314 U.S. at 347, 62 S.Ct. 248. No matter the method used, the sovereign's intent to extinguish must be clear and unambiguous; "an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Id*. at 354, 62 S.Ct. 248.

Moreover, "if there is doubt whether aboriginal title has been validly extinguished by the United States, any 'doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of' the Indians." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1162 (quoting *Santa Fe Pac. R.R. Co.*, 314 U.S. at 354, 62 S.Ct. 248). "[T]he actual act (or acts) of extinguishment must be plain and unambiguous. In the absence of a clear and plain indication in the public records that the sovereign intended to extinguish all of the rights in their property, Indian title continues." *Lipan Apache Tribe v. United States*, 180 Ct. Cl. 487, 492

(1967) (quotations and alteration omitted) (quoting *Santa Fe Pac. R.R. Co.*, 314 U.S. at 353, 62 S.Ct. 248).

*Abouselman*, 976 F.3d at 1155-56.

After discussing federal court decisions that have addressed the extinguishment of aboriginal rights, the Tenth Circuit stated:

> In all cases addressing extinguishment courts have pointed to specific sovereign action that was directed to a right held by an Indian tribe. They have then looked at the actual adverse impact of that directed action on the tribal right at issue. Only when that review has shown a sovereign intent to extinguish an Indian right, have courts found that an extinguishment was effectuated. An intent to extinguish can only be found when there is an affirmative sovereign action focused at a specific right that is held by an Indian tribe that was intended to, and did in fact, have a sufficiently adverse impact on the right at issue. *Plamondon ex rel. Cowlitz Tribe of Indians*, 467 F.2d at 938 (the court looked at the fact that Congress opened the Cowlitz land for white settlement, but it concluded that the small number of settlers—the actual adverse impact—was insufficient to extinguish). Thus, a sovereign cannot extinguish aboriginal rights without affirmatively acting in a manner adverse to the specific aboriginal rights at issue.

*Abouselman*, 976 F.3d at 1158.   The Tenth Circuit concluded that "a sovereign must affirmatively take an action to exercise complete dominion in a manner adverse to the Indians' right of occupancy sufficient to extinguish aboriginal title."  *Abouselman*, 976 F.3d at 1155-58.

The Tenth Circuit then explained why Spain's general administration of its water administrations system was not adverse to the Pueblos' aboriginal rights:

> There is no indication, let alone a clear and plain indication, that Spain intended to extinguish any aboriginal rights of these three Pueblos. Spain's general assertion of governing authority does not indicate any intent to extinguish the Pueblos' water rights because, in general, Spain respected the Indians and their possessions. *See* Felix S. Cohen, <u>Spanish Origin of Indian Rights in the Law of the United States</u>, 31 Geo. L.J. 1, 9 (1942) ("[T]he humane principles which guide our own law in Indian affairs all faithfully follow ... the edicts of Spanish kings.").
>
> Even if we narrow our focus to Spain's system for administering water, this system was guided by general principles, none of which specifically mention any Indian tribes, let alone the Pueblos of Jemez, Santa Ana, and Zia. Although Spain

possessed the right to conduct repartimientos to allocate water, it never exercised that right as to the Pueblos here. There is no showing that Spain clearly intended to extinguish the rights of these specific Pueblos, when nothing presented by the parties indicates that Spain had any issues with the Pueblos' water use. The passive implementation of a generally applicable water administration system does not establish Spain's clear intent to extinguish the aboriginal water rights of these three Pueblos.

Nor is there any evidence in the experts' reports or testimony that Spain's water administration system was adverse to the Pueblos, as it never actually ended the Pueblos' exclusive use of water or limited their use in any way. A repartimiento was never undertaken on the Jemez River, and there is no evidence that the Pueblos ever decreased their water usage or were unable to increase their usage. Indeed, there is no evidence that Spanish sovereignty had any impact on the Pueblos' use of the water from the Jemez River at all. Because Spain's water administration system had no impact, let alone a negative impact, on the Pueblos' right to use water, it cannot be said that the system was "adverse" to the Pueblos.

*Abouselman*, 976 F.3d at 1160.

**Sovereignty of Mexico and the United States**

The Tenth Circuit summarized Spain's sovereignty but did not summarize the sovereignty of Mexico and the United States because:

Third, no actions taken by Mexico or the United States are before us. Although those actions were before the district court, the district court determined that the Pueblos' aboriginal water rights were extinguished by Spain before either Mexico or the United States took sovereignty over the Pueblos' land. Thus, as explained above, any action taken by Mexico or the United States were mooted by that determination.

None of the above-mentioned issues was raised by the certified order, and thus they are not properly before us for consideration on interlocutory review.

*Abouselman*, 976 F.3d at 1153.

Mexico took over sovereignty from Spain "by virtue of the Treaty of Cordova, which was August 21, 1821." Cutter Tr. 54. The treaty between Spain and the new Mexican government, and the Mexican declaration of independence, reaffirmed the principles of the Plan of Iguala.

*See United States v. Ritchie*, 58 U.S. 525, 538 (1854).  The Plan of Iguala declared that "all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy," and that "the person and property of every citizen will be respected and protected by the [Mexican] government."  *Id.*  "The laws governing land and water rights during the Mexican period remained substantially the same as during the Spanish colonial era." Cutter Report at 71; *see also* Cutter Tr. at 57 ("the rules in place under the Spanish regime continued under the Mexican regime").  Mexico ruled the area until it ceded the territory to the United States in the Treaty of Guadalupe Hidalgo.  *See* 9 Stat. 922 (1848).

"In the Treaty of Guadalupe Hidalgo, the United States agreed to protect rights recognized by prior sovereigns."  *New Mexico v. Aamodt*, 537 F.2d 1102, 1108-1109 (10th Cir. 1976).

### Scope of the Tenth Circuit's Opinion

The Tenth Circuit stated:

> In sum, we have jurisdiction to address only the controlling question of law presented by the order below: Whether, as a matter of law, a sovereign can extinguish aboriginal rights to water by the mere imposition of its authority over such water without any affirmative act.

*Abouselman*, 976 F.3d at 1153.  After concluding that the sovereign may extinguish aboriginal rights only after it exercises its authority over its land and resources through clear and adverse affirmative action, the Tenth Circuit remanded the case to this Court "for further proceedings consistent with this opinion."  *Abouselman*, 976 F.3d at 1160.

The Court has reviewed the record, including the evidence and arguments presented to Judge Lynch, and makes the following determinations.

### ABORIGINAL WATER RIGHTS

The first part of Issue No. 1 asks: "Have the Pueblos ever possessed aboriginal water rights in connection with their grant or trust lands?"  "The district court, adopting the magistrate judge's findings and recommendations, determined that the Pueblos did, at one point, possess aboriginal water rights to the Jemez River in connection with their aboriginal title.  No party disputes this determination."  *Abouselman*, 976 F.3d at 1152.

**Extinguishment and Modification**

The second part of Issue No. 1 asks: "have those aboriginal water rights been modified or extinguished in any way by any actions of Spain, Mexico or the United States?"  In addition to arguing whether the aboriginal water rights have been modified or extinguished, the Parties also discuss the quantification of those rights.  This Order only considers whether the aboriginal water rights have been modified or extinguished.  The Court will consider quantification when it addresses Issue No. 3: "If the Pueblos have aboriginal water rights or *Winans* reserved water rights, what standards apply to quantify such rights?"

The Coalition and the State contend that two Spanish land grants to non-Pueblos extinguished the Pueblos' aboriginal rights arguing that Spain's grants of land to non-Pueblos, with the implied right to use water from the Jemez River, were affirmative acts that were adverse to the Pueblos' aboriginal rights because the Pueblos no longer had the unilateral right to expand their use of the water from the Jemez River.  *See* Coalition's Response at 12-17, Doc. 4484, filed October 21, 2022; State's Response at 23-26, Doc. 4485, filed October 21, 2022.

The Spanish land grants did not, by themselves, extinguish aboriginal title, if any, to the water of the Jemez River used by the non-Pueblos because those grants did not decrease the Pueblos' water usage and did not make the Pueblos unable to increase their usage.  *See Pueblo of*

*Jemez v. United States*, 790 F.3d 1143, 1170 (10th Cir. 2015) (holding that the United States'

grant of land to private landowners "did not *by itself* extinguish aboriginal title of the Jemez

Pueblo" but also holding there was no evidence that private landowners' use of the land was

inconsistent with tribe's occupancy of the land) (emphasis added).

The Court also concludes that Mexico did not extinguish the Pueblos' aboriginal water

rights. The record shows that:

> "No repartimientos of water were ever made by Spanish or Mexican authorities
> regarding the Jemez Valley waters used by Jemez, Zia, and Santa Ana. Thus, the
> governments of Spain and Mexico took no action to intervene in the uses that
> these Pueblos made of their water supply; nor did Spain or Mexico act to reduce
> or modify such use."

*Abouselman*, 976 F.3d at 1155 (quoting Dr. Cutter's opinion). The State and the Coalition point

to no evidence in the record that Mexico exercised its authority through clear and adverse

affirmative action to decrease the Pueblos' use of water or to prevent the Pueblos from

increasing their use of water.

The Pueblo of Santa Ana and the United States contend the Treaty of Guadalupe Hidalgo

did not extinguish the Pueblos' aboriginal water rights because the Treaty protected the Pueblos'

rights as they existed at the time. *See* United States' Supp. Opening Brief at 22-24, Doc. 4476;

Pueblo of Santa Ana's Supp. Reply Brief at 17-18, Doc. 4489.

The Court concludes that the United States, through the 1848 Treaty of Guadalupe

Hidalgo in which it agreed to protect the rights of Pueblo and non-Pueblo Mexican citizens,

extinguished the Pueblos' aboriginal water rights, if any, to the water used by non-Pueblo

Mexican citizens.

> Only the sovereign may extinguish aboriginal title, whether "by treaty, by the
> sword, by purchase, by the exercise of complete dominion adverse to the right of

11

occupancy, or otherwise." *Santa Fe*, 314 U.S. at 347, 62 S.Ct. 248. **Extinguishment may also result indirectly through "white settlement and use, authorized by the federal government both statutorily and in fact."** *Jemez I*, 790 F.3d at 1166 (citing *Pueblo of San Ildefonso*, 513 F.2d at 1393). But "[n]o matter the method used, the sovereign's intent to extinguish must be clear and unambiguous." *United States v. Abouselman*, 976 F.3d 1146, 1156 (10th Cir. 2020).

*Pueblo of Jemez v. United States*, 63 F.4th 881, 891 (10th Cir. 2023) (entered after completion of briefing by the Parties) (emphasis added).  Spain and Mexico allowed non-Pueblos to use the water for approximately 250 years, from about 1598 until 1848, when, in the Treaty of Guadalupe Hidalgo, the United States agreed to protect non-Pueblos' rights recognized by Spain and Mexico.  Although the Treaty of Guadalupe Hidalgo did not explicitly state it was terminating the Pueblos' aboriginal rights to any of the water of the Jemez River that Spain and Mexico allowed the non-Pueblos to use, the United States' intent to extinguish the Pueblos' aboriginal rights to the fraction of the flow used by non-Pueblos, given that the amount of the total flow of the Jemez River is finite, is clear and unambiguous.  *See Abouselman*, 976 F.3d at 1155 (noting that a main principle guiding Spain's control of water was that "one could not use public waters to the detriment of other users" and that a repartimiento, similar in concept to a water adjudication, occurred only when there was a conflict between users thus indicating that Spain recognized the limited amount of water available in the Jemez River).  The non-Pueblos' use of that water is inconsistent with the Pueblos' use of that water.

**First Sub-issue to Issue 1: Did the Acts of 1866, 1870 and 1877 have any effect on the Pueblos' water rights, and if so, what effect?**

The Act of 1866 is titled "An Act granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for other Purposes."  Act of July 26, 1866, 14 Stat. 251.  The Act of 1866 declared the mineral lands of the public domain to be free and open to exploration and

12

occupation by citizens and other persons.  *See* Act of 1866, Sec. 1.  The Act of 1870 amended

the Act of 1866.  *See* Act of July 9, 1870, 16 Stat. 217.  The Act of 1866 as amended by the Act

of 1870, codified at 43 U.S.C. § 661, provides:

> Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed . . .

> All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by this section.

43 U.S.C. § 661.  The Act of 1877 provided for the sale of desert lands in New Mexico and other

States and Territories.  *See* Act of March 3, 1877, 19 Stat. 377, codified at 43 U.S.C. § 321.  The

Act of 1877 states:

> It shall be lawful for any citizen of the United States, or [other certain persons] to file a declaration . . . that he intends to reclaim a tract of desert land not exceeding one-half section, by conducting water upon the same, within the period of three years thereafter: *Provided, however,* That the right to the use of water by the person so conducting the same, on or to any tract of desert land of three hundred and twenty acres shall depend upon bona fide prior appropriation; and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes subject to existing rights . . .

43 U.S.C. § 321.

The Acts of 1866, 1870 and 1877 did not extinguish the Pueblos' aboriginal water rights;

they granted a right of way to vested water rights holders and stated those rights would be

protected.  None of the Parties contend that the Acts of 1866, 1870 and 1877 directly affected the

Pueblos' aboriginal rights.  The Coalition expressed its concern that the Acts of 1866, 1870 and

1877:

> recognized and protected the Pueblos' actual, existing use of water, just as they
> recognized and protected the actual, existing use of water by the Non-Pueblo
> *parciantes* within the Spanish land grants . . . The Coalition has never taken the
> position that the Pueblos' actual use of water as of 1848 was not protected by the
> Treaty and confirmed under those Acts.  The same is true of acequia members . . .
> Recognition of any right in the Pueblos to commence new uses of water with a
> prior right would displace uses previously vested in the Coalition's predecessors
> and is precisely the harm to which the Acts of 1866, 1870 and 1877 Acts were
> directed.

Doc. 4484 at 25-27.  The Coalition's concern relates to quantification of the Pueblos' rights

which the Court will address in Issue No. 3.

**Second Sub-issue to Issue 1: Did the Pueblo Lands Acts of 1924 and 1933 have any effect on
the Pueblos' water rights, and if so, what effect?**

The purpose of the Pueblo Lands Act of June 7, 1924, was "t[t]o quiet title to the lands

within Pueblo Indian land grants, and for other purposes."  43 Stat. 636.  The Act of 1924 made

the United States liable for the fair market value of those tracts of lands and water rights that

could have been recovered for the Indians by the United States by seasonable prosecution.  *See*

43 Stat. 638 § 6(c).  The Pueblo Compensation Act of May 31, 1933, authorized appropriations

to pay in part the liability of the United States to the Indian Pueblos.  *See* 48 Stat. 108.  The Act

of 1933 also stated: "Nothing herein contained shall in any manner be construed to deprive any

of the Pueblo Indians of a prior right to the use of water from streams running through or

bordering on their respective pueblos . . . ."  48 Stat. 111 § 9.

The Tenth Circuit discussed the Pueblo Lands Acts of 1924 and 1933:

14

The decision in *United States v. Joseph* [94 U.S. 614 (1876)] placing the Pueblos outside the protection of federal laws resulted in the acquisition and occupation by non-Indians of land within the Pueblos. The United States did nothing to protect the Pueblos. The *Sandoval* [231 U.S. 28 (1913)] and *Candelaria* [271 U.S. 432 (1925)] decisions overturning Joseph caused uncertainty as to the titles of both the Indians and the non-Indians. The 1924 Act, 43 Stat. 636, was enacted to quiet the title to lands within the Pueblo Indian Land Grants. It established the 'Pueblo Lands Board,' and directed it to investigate, determine and report the lands within the exterior boundaries of the Pueblos, the titles to which had been extinguished in accordance with the provisions of the Act.

In the 1933 Act, Congress approved compensation for the Pueblos in excess of that recommended by the Lands Board. The Committee Report says that this was done because of an error of the Lands Board. H.Rep.No.123, p. 3, infra. Private counsel for the Pueblos vigorously supported the increase in the awards. The State argues that the increase was to pay the Pueblos for whatever reserved rights they might have had to water.

The error of the Lands Board had nothing to do with reserved rights. The error was a failure to recognize that, when the claims of non-Indians were sustained, the Pueblos lost both lands and the water rights appurtenant thereto. Litigation brought pursuant to the 1924 Act had resulted in decisions that appurtenant water went with the land. Congress increased the awards to include the value of appurtenant water.

The Committee Reports which preceded the passage of the 1933 Act support this conclusion. For practical purposes the Senate and House Reports are identical. See H.Rep.No.123, 73d Cong., 1st Sess. and S.Rep.No.73 at the same session. After referring to the mentioned court decisions, the House Report reads, pp. 3—4:

> 'The Indian has, accordingly, lost, under court decrees, under the doctrine of res adjudicata, certain lands with the water rights appurtenant thereto, for which loss section 6 of the act of June 7, 1924, clearly provided that he should be compensated. The present bill does no more than bring the awards up to an amount which the appraisers appointed by the Board found to be the value of this land and the water rights appurtenant thereto.'

. . . .

The question of the water rights of the Pueblos for use on the land which they retained was raised in the congressional hearings. Senators Bratton and Cutting of New Mexico asserted that the Pueblos were entitled to no preferential right.

15

Congressman Leavitt of Montana stated, Hearings Before the House Committee on Indian Affairs on H.R. 9071, 72d Cong., 1st Sess., at 122, that:

> '(W)e have got to be careful in our wording of the act of Congress that we do not extinguish an Indian right that has been long existent by a present act of Congress.'

A representative of the Secretary of the Interior proposed an amendment which he characterized as recognizing for the Indians a prior right to the use of water for domestic, stockwater and irrigation purposes for lands remaining in Indian ownership. The proposal became s 9 of the 1933 Act and reads:

> 'Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water from streams running through or bordering on their respective pueblos for domestic, stockwater, and irrigation purposes for the lands remaining in Indian ownership, and such water rights shall not be subject to loss by nonuse or abandonment thereof as long as title to said lands shall remain in the Indians.'

*New Mexico v. Aamodt*, 537 F.2d 1102, 1109-1110 (10th Cir. 1976).

The Coalition contends "The 1924 and 1933 Acts only recognized the Pueblos' actual uses" and the legislative history makes clear "that Congress rejected any notion that the Pueblos subject thereto had some kind of 'expanding' water right with first priority."  Doc. 4484 at 28; Doc. 4361 at 43-69 (discussing the legislative history and concluding the Acts "recogniz[ed] only appurtenant water rights acquired under the doctrine of prior appropriation in the Pueblos and non-Indians alike" and "did not recognize a right in the Pueblos to expand a prior right"); *see also* Doc. 4363 at 15-18 (State of New Mexico stating "The only effect of the Acts on the Pueblos' water rights was to determine which water rights had been extinguished and vested in non-Indians on lands within their grant lands, and to compensate the Pueblos for those losses;" "Section 9 of the 1933 Act protected the Pueblos' existing water rights appurtenant to then-irrigated lands remaining in their ownership;" and "with respect to those lands, [the Pueblos]

would get a first priority, but there was no expanding water right").

The Court concludes that the Acts of 1924 and 1933 did not directly affect the Pueblos' water rights remaining in Pueblo ownership because there is no language in the Acts indicating that Congress intended to extinguish or limit the Pueblos' water rights. *See* Doc. 4380 at 46 (Transcript of hearing before U.S. Magistrate Judge William P. Lynch at 363-366, April 1, 2014, expert witness for the State Professor G. Emlen Hall testifying that there is no language in the Act of 1924 that affirmatively acts to limit Pueblo water rights to lands actually irrigated between 1846 and 1924, the Act only refers to water in terms of valuating the water lost for purposes of compensation).

**Third Sub-issue to Issue 1: Did the Indian Claims Commission Act have any effect on the Pueblos' water rights, and if so, what effect?**

Congress enacted the Indian Claims Commission Act "To create an Indian Claims Commission, to provide for the powers, duties, and functions thereof, and for other purposes." Indian Claims Commission Act, Act of August 13, 1946, 60 Stat. 1049, c. 959 ("ICCA") (formerly codified as amended at 25 U.S.C. §§ 70-70v; now repealed). ICCA directed the Commission to "hear and determine [various] claims [in five categories] against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians" including "claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant." 60 Stat. 1050. "The payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." 60 Stat. 1055.

None of the Parties asserted in their initial briefs on Issue No. 1, filed in 2014, that ICCA extinguished or modified the Pueblos' water rights.  *See* Opening Brief of Pueblos of Santa Ana, Zia and Jemez and the United States, on Issues 1 and 2 at 9, Doc. 4362, filed August 19, 2014 ("Neither the Indian Claims Commission Act nor any proceedings brought under the Act to which the any of the three Pueblos who are parties herein were party, had any effect on the Pueblos' water rights associated with their Aboriginal Lands") (citation omitted);  State of New Mexico's Opening Brief on Issues 1 and 2 at 12, Doc. 4363, filed August 19, 2014 ("The Indian Claims Commission Act and the actions of the Indian Claims Commission neither affected nor determined the rights of the Pueblos to water from common sources."); Coalition's Opening Brief on Issues 1 and 2 at 76-77, Doc. 4361, filed August 19, 2014 (stating ICCA "established a deadline and process for asserting aboriginal claims" and "any Pueblo aboriginal title surviving the change of sovereigns was extinguished in the Pueblo grant lands by the Acts of 1854, 1858 and 1869 [evaluating claims to land under the laws, customs and usages of Spain and Mexico and confirming land claims] . . . Any claims the Pueblos may have had under the 1924 and 1933 Acts have already been resolved and compensation awarded ... various federal actions in the first half of the 20th Century . . . extinguished tribal aboriginal title on those lands. Any other claims were either heard and determined by the Indian Claims Commission or are now barred by the ICCA"); Coalition's Response Brief on Issues 1 and 2 at 33, Doc. 4365, filed October 20, 2014 (stating ICCA "does not support the US/Pueblos' claims of aboriginal water rights").

In its Supplemental Brief on Issues 1 and 2, filed in 2022, the Pueblo of Santa Ana stated "neither the Indian Claims Commission Act nor any proceedings under it extinguished or modified any of these Pueblos' aboriginal water rights."  Doc. 4475 at 15, filed September 7,

2022.  In its Response, also filed in 2022, to the Pueblo of Santa Ana's Supplemental Brief, the Coalition does not discuss the effect of ICCA on the Pueblos' water rights.  *See* Coalition's Response to Opening Supplemental Briefs of the United States and the Pueblo of Santa Ana on Issues 1 and 2 at 1, Doc. 4484, filed October 21, 2022 (referring the Court to its Opening, Response and Reply Briefs filed in 2014).

The Court concludes that the Indian Claims Commission Act did not have any effect on the Pueblos' water rights.  The purpose of ICCA was to provide compensation to Indians for claims against the United States as determined by the Indian Claims Commission.  There is no language in ICCA showing an intent to extinguish or modify the Pueblos' water rights.

### *WINANS* DOCTRINE

Issue No. 2 asks: "Does the *Winans* doctrine apply to any of the Pueblos' grant or trust lands?"  Because the Court's initial determination that the Pueblos' aboriginal rights had been extinguished by Spain mooted Issue No. 2, the Tenth Circuit did not address whether the *Winans* doctrine applies to any of the Pueblos' lands.

*Winans* arose from a "suit brought to enjoin [non-Indians] from obstructing certain Indians of the Yakima Nation . . . from exercising fishing rights and privileges on the Columbia River . . . claimed under the provisions of the treaty between the United States and the Indians, made in 1859."  *United States v. Winans*, 198 U.S. 371, 377 (1905).  The defendants in *Winans* acquired land adjacent to the Columbia River from the United States and placed in the river in front of their lands devices for taking fish, called fishing wheels for which licenses were granted to them by the State of Washington.  *See Winans*, 198 U.S. at 379.  The *Winans* defendants contended that they had the power to exclude the Indians from the river by reason of their

ownership of the land bordering the river.  *See Winans*, 198 U.S. at 379.  The Circuit Court of the United States for the District of Washington agreed with the defendants "decid[ing] that the Indians acquired no rights but what any inhabitant of the territory or state would have.  Indeed, acquired no rights but such as they would have without the treaty."  *Winans*, 198 U.S. at 380.

The Supreme Court of the United States reversed the lower court's decision explaining:

> [Under the treaty, the Indians] cede[d] . . . to the United States all their right, title, and interest in and to the lands and country occupied and claimed by them," [reserving a portion of those land for the use and occupation of the Indians].
> . . . .
> [The treaty guaranteed] the right to all citizens of the United States to enter upon and occupy as settlers any lands not actually occupied and cultivated by said Indians at this time, and not included in the reservation.
> . . . .
> [The treaty secured to the Indians] "the right of taking fish at all usual and accustomed places, in common with citizens of the territory."    At the time the treaty was made the fishing places were part of the Indian country, subject to the occupancy of the Indians, with all the rights such occupancy gave.  The object of the treaty was to limit the occupancy to certain lands, and to define rights outside of them.
> . . . .
> The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians . . . the treaty was not a grant of rights to the Indians, but a grant of right from them, a reservation of those not granted . . . There was an exclusive right of fishing reserved within certain boundaries.  There was a right outside of those boundaries reserved 'in common with citizens of the territory.' As a mere right, it was not exclusive in the Indians.  Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise.  They were given 'the right of taking fish at all usual and accustomed places . . . .

*Winans*, 198 U.S. at 377-381.

"*Winans* rights are essentially recognized aboriginal rights."  *Abouselman*, 976 F.3d at 1152.

However, they deviate from aboriginal rights in that they are governmentally

recognized; their abrogation therefore requires constitutional compensation.[5] But proof of their scope is essentially identical to that required to prove the existence of an aboriginal claim. Thus, the scope of a *Winans* right is dependent on actual use over an extended period of time, although it is not a function of the extent of land title.

*Winans* rights preserve pre-existing uses, rather than establishing new uses. Their priority dates are therefore not related to the establishment of a land reservation but date from pre-white settlement, or "time immemorial." The quantity of *Winans* water rights reserved is not fixed on practicably irrigable acreage but is instead a "needs-based" test. *Winans* rights are unusual in that they commonly are nonconsumptive. A *Winans* right for hunting and fishing purpose "consists of the right to prevent other appropriators from depleting the streams waters below a protected level in any area where the non-consumptive right applies." *Winans* rights also include water to support gathering rights as well as hunting, fishing, and trapping rights. This includes sufficient water to support "productive habitat."

2 Waters and Water Rights § 37.02(a)(2) (2023) (some footnotes omitted).

The Pueblo of Santa Ana and the United States assert that that the *Winans* doctrine applies the Pueblos' aboriginal water rights because Congress expressly recognized those rights by Section 7 of the Act of February 27, 1851, 9 Stat. 574, 587, and by Section 9 of the Pueblo Compensation Act of 1933, 48 Stat. 108, 111. *See* Doc. 4475 at 24; Doc. 4362 at 43-44.

Section 7 of the Act of February 27, 1851, states:

*And be it further enacted*, That all the laws now in force, regulating trade and intercourse with the Indian tribes, or such provisions of the same as may be applicable, shall be, and the same are hereby, extended over the Indian tribes in the Territories of New Mexico and Utah.

9 Stat. 574, 587. The United States Supreme Court stated that Section 7 of the Act of February 27, 1851, extended the Indian Trade and Intercourse Act of June 30, 1834, 4 Stat. 729, over 'the Indian tribes in the Territories of New Mexico and Utah' and:

---

[5] *See* Felix Cohen, Handbook of Federal Indian Law 1121–22, 975–82, 974–75 (2005 ed.). Aboriginal title that is not recognized by subsequent treaty, statute, or agreement may be terminated by Congress without payment of just compensation. Tee-Hit-Ton Indians v. United States, 348 U.S. 272 (1955).

21

The Act of 1851 obviously did not create any Indian right of occupancy which did not previously exist. *But it plainly indicates that in 1851 Congress desired to continue in these territories the unquestioned general policy of the Federal government to recognize such right of occupancy.* As stated by Chief Justice Marshall in *Worcester v. Georgia, supra,* 6 Pet. at page 557, 8 L.Ed. 483, the Indian trade and intercourse acts 'manifestly consider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.'

*United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 347-348 (1941) (emphasis added).

Section 9 of the Pueblo Compensation Act of 1933, states:

Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water from streams running through or bordering on their respective lands remaining in Indian ownership, and such water rights shall not be subject to loss by nonuse or abandonment thereof as long as title to said lands shall remain in the Indians.

48 Stat. 108, 111.

The Coalition and the State contend that the *Winans* doctrine does not apply because there is no treaty or agreement between the Pueblos and the United States that specifically recognizes or reserves any Pueblo aboriginal right.  *See* Doc. 4361 at 80 (Coalition); Doc. 4363 at 19 (State of New Mexico).  Both the Coalition and the State quote dicta from the Court's 2004 Opinion that states: "Here there is no treaty or agreement between the Pueblos and the United States that fairly specifically recognizes the Pueblos' aboriginal rights."  Doc. 4361 at 80; Doc. 4363 at 18; *see* 2004 Opinion at 28, Doc. 4051 (denying motion for summary judgment seeking a ruling that the *Winans* doctrine does not apply to Pueblo grant lands and stating the Parties will be allowed to raise the issue of the applicability of the *Winans* doctrine to Pueblo grant lands following discovery).  The Coalition and the State also argue the *Winans* doctrine does not support the Pueblos' claims to expanding aboriginal water rights for future uses of water.  *See*

22

Doc. 4484 at 7-11; Doc. 4485 at 11-12.  The Court will address the quantification of aboriginal and *Winans* water rights in Issue No. 3.

The Court concludes that the *Winans* doctrine applies to the Pueblos' aboriginal water rights.  While the water rights in *Winans* were reserved by the Indians in a treaty with the United States, the State and the Coalition have not shown that that governmental recognition of aboriginal water rights must occur in a treaty between the subject Indians and the United States. *See Abouselman*, 976 F.3d at 1152 ("*Winans* rights are essentially recognized aboriginal rights"). The Tenth Circuit explained, and this Court has concluded above, that the Pueblos had aboriginal rights and that neither Spain nor Mexico extinguished those aboriginal rights.  While the Treaty of Guadalupe Hidalgo and Section 7 of the Act of February 27, 1851 do not specifically mention water rights, they expressly recognize the Pueblos' existing rights, which include aboriginal water rights.  *See New Mexico v. Aamodt*, 537 F.2d 1102, 1109-1110 (10th Cir. 1976) ("In the Treaty of Guadalupe Hidalgo, the United States agreed to protect rights recognized by prior sovereigns"); *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 347-348 (1941) (stating the Act of February 27, 1851 "plainly indicates that in 1851 Congress desired to continue in these territories the unquestioned general policy of the Federal government to recognize such right of occupancy"); *see also* Section 9 of the Pueblo Compensation Act of 1933 (stating "Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water from streams running through or bordering on their respective lands remaining in Indian ownership").

## CHARLOTTE MITCHELL'S BRIEF AND MOTION

Charlotte Mitchell is a claimant in this case.  *See* Entry of Appearance for Defendants

James and Charlotte Mitchell by attorney Lana E. Marcussen, Doc. 3460, filed July 2, 1996; *but also see* Pueblo of Santa Ana's Supplemental Reply Brief at 2 n.1, Doc. 4490, filed November 21, 2022 (stating Ms. Mitchell "is not shown as having any water rights adjudicated to her in the Addendum to the Partial Final Judgment and Decree on Non-Pueblo, Non-Federal Proprietary Water Rights issued on December 1, 2000 (Doc. 3948)).

Ms. Mitchell filed a Supplemental Response Brief on Issues No. 1 and No. 2 which discusses the history of federal Indian law and policy and concludes:

> The federal government is without authority to remove the jurisdiction of the State of New Mexico over the waters of the Rio Grande or over the Indian country that makes up the Santa Ana Pueblo as a federal Indian reservation. Therefore, the decision in *United States v. Winans* is no longer good law . . . This court should deny the existence of any federal reserved right in land or water.

Doc. 4481 at 24, filed October 14, 2022; Notice of Errata, Doc. 4483, filed October 20, 2022 (attaching a corrected Response Brief with the only corrections being the addition of citations and the initials of the trial court judge).

The Court declines to consider Ms. Mitchell's Response because the issues currently before the Court relate to the Pueblo of Santa Ana's aboriginal rights and whether those rights have been recognized by the United States; Issues 1 and 2 do not related to reserved rights. *See* Pueblo of Santa Ana's Reply Brief at 2 n.1 (stating the Pueblo of Santa Ana "has not claimed any federally reserved rights in this phase of this litigation (regarding Issues 1 and 2), and that *Winans* does not deal with reserved rights"); United States Reply Brief at 19, Doc. 4489, filed November 21, 2022 (stating Ms. Mitchell's Response "does not address any issues regarding extinguishment of aboriginal rights by Spain and Mexico or the United States and its contention that *Winans* is no longer good law is specious;" "the only discussion in [Ms. Mitchell's

Response] related to Issues 1 and 2 is the contention that *Winans* was allegedly overruled by *Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486 (2022) . . . *Castro Huerta* addressed a discrete issue relating to criminal jurisdiction on Indian lands and did not in any fashion address issues pertaining to the body of federal law dealing with federal Indian reserved water rights and Indian aboriginal water rights"); *Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486, 2504-05 (2022) ("We conclude that the Federal Government and the State [of Oklahoma] have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country").

Counsel for Charlotte Mitchell also filed a motion stating:

On November 4th, 2022, the United States Supreme Court accepted *Arizona v. Navajo Nation*, Docket. No. 21-1484 and *Navajo Nation v. Haaland*, Docket No. 22-51 as consolidated to be heard this term. The questions presented in these cases overlap Issues No. 1 and Issue 2 in this case. *Arizona v. Navajo Nation* questions the federal reserved rights doctrine while the Navajo Nation sues the Secretary of the Interior to determine whether the federal Indian trust relationship is in any way enforceable by the tribe. Counsel for Charlotte Mitchell thinks it is important for this Court to be aware of these overlapping cases set for oral argument on March 20, 2023. The opening brief filed on December 19, 2022 by the United States on behalf of the Secretary of the Interior disclaims any enforceable Indian trust relationship that requires raising a Winter's doctrine claim for any Indian tribe in the Colorado River watershed. The brief before the Supreme Court does argue in contrast to the brief filed by the United States in this case regarding the Pueblo Indians on the Rio Grande. Counsel also participated in the filing of an *amicus* brief for the Citizen's Equal Rights Foundation in support of neither party in these consolidated cases.

Motion to Take Judicial Notice, Doc. 4494, filed February 13, 2023.

The Court denies Ms. Mitchell's Motion to Take Judicial Notice because Ms. Mitchell has not shown that the United States' brief before the United States Supreme Court has a direct relationship to whether the Pueblos' aboriginal rights have been extinguished and whether Congress has recognized the Pueblos' aboriginal water rights, or that notice of the United States' brief before the United States Supreme Court will materially advance the resolution of this case.

*See Bruce v. City and County of Denver*, 57 F.4th 738, 741 n.3 (10th Cir. 2023) ("In ruling on a motion to dismiss, a federal court may take judicial notice of another court's publicly filed records if they have a direct relation to matters at issue. *See Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006); *see also St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979). Furthermore, "the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal*, 453 F.3d at 1265 n.24 (quotation marks and brackets omitted)."). Charlotte Mitchell's Motion to Take Judicial Notice, Doc. 4494, filed February 13, 2023, is **DENIED.**

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**