IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, on its
own behalf and on behalf of the
PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,

and

STATE OF NEW MEXICO, *ex rel.*
State Engineer,

        Plaintiffs,                                    No. 6:83-cv-01041-KWR-JMR
                                                                 JEMEZ RIVER ADJUDICATION

and

THE PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,

        Plaintiffs-in-Intervention,

v.

TOM ABOUSLEMAN, *et al.*,

        Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING ISSUE 3

Plaintiffs seek an adjudication of the rights to the use of waters of the Jemez River stream system. *See* N.M. Stat. Ann. § 72-4-19 (upon adjudication of the water rights, a decree shall be prepared which declares, "as to the water right adjudged to each party, the priority, amount, purpose, periods and place of use, and as to water used for irrigation, except as otherwise provided in this article, the specific tracts of land to which it shall be appurtenant, together with such other conditions as may be necessary to define the right and its priority").

## PROCEDURAL BACKGROUND

The United States, the Pueblos of Jemez, Santa Ana and Zia, the State of New Mexico

and the Jemez River Basin Water Users Coalition ("Coalition") (collectively "the Parties") identified five threshold legal issues to be addressed before the Court determines the Pueblos' water rights. *See* Doc. 4237 at 2-3, filed April 13, 2012; Doc. 4239 at 2-3, filed April 13, 2012. The United States and the Pueblos later indicated they are not asserting that the Pueblos are entitled to riparian rights which were the subject of Issue No. 5. *See* Mem. Op. and Order at 3, Doc. 4293, filed December 20, 2012 (stating the Court will not determine whether the Pueblos are entitled to riparian rights). The Parties then submitted briefs for Issues Nos. 1-4. *See* Doc's 4361 *et seq.*, filed August 19, 2014 (Issues Nos. 1 and 2); Doc's 4280 *et seq.*, filed November 13, 2012 (Issue No. 3); Doc's 4267 et seq., filed September 25, 2012 (Issue No. 4).

On October 4, 2016, after considering the briefs of the Parties, witness testimony and expert reports, United States Magistrate Judge William P. Lynch entered his Proposed Findings and Recommended Disposition Regarding Issues 1 and 2 recommending that "the Court find that Spain imposed a legal system to administer the use of public waters which extinguished the Pueblos' right to increase their use of public water without restriction, and that Spain's exercise of complete dominion over the use of public waters extinguished the Pueblos' aboriginal water rights." Doc. 4383 at 14. On September 30, 2017, after considering objections, the Court overruled the objections and adopted Judge Lynch's Proposed Findings and Recommended Disposition Regarding Issues 1 and 2. *See* Doc. 4397 (Vázquez, J.). The Court granted the motions of the Pueblos and the United States and certified its Order ruling on Issues 1 and 2 for interlocutory appeal. *See* Doc. 4421, filed September 11, 2018 (Vázquez, J.).

The United States Court of Appeal reversed the Court's determination in its September 30, 2017, Order and remanded the case for further proceedings. *See* Mandate,

2

Doc. 4439, filed December 29, 2020; *United States v. Abouselman*, 976 F.3d 1146 (10th Cir. 2020). After allowing the Parties to file supplemental briefing on Issues 1 and 2 to address the issues remaining due to the Tenth Circuit's decision, the Court entered its Memorandum Opinion and Order Regarding Issues 1 and 2. *See* Doc. 4506, filed September 28, 2023 ("2023 Order") (Riggs, J.).

The matter now before the Court is Issue No. 3. United States Magistrate Judge Jerry H. Ritter ordered that additional briefing on Issue No. 3 begin after the Court rules on Issues Nos. 1 and 2, because the Court's ruling on those issue could affect how Issue No. 3 is addressed. *See* Doc. 4452, filed October 28, 2021. With the Court having ruled on Issues Nos. 1 and 2, United States Magistrate Judge Jennifer M. Rozzoni ordered the Parties to file revised briefs regarding Issue No. 3. *See* Doc. 4523, filed July 11, 2024.

The Parties completed their revised briefing on November 4, 2024. *See* Doc's 4546-4548. Prior to completion of the revised briefing, the Pueblos of Sandia, Cochiti, Isleta San Felipe, Santa Clara and Santo Domino ("Amici Pueblos"), which are not parties to this case, filed a motion for leave to file an amicus curiae brief in support to the briefs of the Pueblo of Santa Ana and the United States on Issue No. 3. *See* Doc. 4542, filed October 18, 2024. The Court granted the Amici Pueblos' motion in part limiting the amicus brief "to addressing the legal issue of whether the difficulty of proving the amount of water use prior to 1848 is a factor the Court must consider in quantifying the Pueblo of Santa Ana's water rights under Issue No. 3." Doc. 4554, filed March 7, 2025. Briefing on the amicus brief was completed on May 30, 2025. *See* Reply of the Amici Pueblos and Pueblo of Santa Ana, Doc. 4560.

## **ISSUE NO. 3**

The Parties stated Issue No. 3 as follows:

Issue No. 3:    If the Pueblos have aboriginal water rights or *Winans* reserved water rights, what standards apply to quantify such rights?

Doc. 4237 at 2-3, filed April 13, 2012; Doc. 4239 at 2-3, filed April 13, 2012.

"Aboriginal title denotes an interest that an Indian tribe possesses in land based solely on rights acquired by the Indians as original inhabitants of the land and not upon a statute, treaty, or grant by the sovereign." *Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768, 784 (Fed. Cl. 1993) (citing *Johnson & Graham's Lessee v. M'Intosh*, 21 U.S. 543, 574 (1823)). Aboriginal title "is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians." *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955). In addition to the right to occupancy of lands, aboriginal title includes the use of the waters and natural resources on those lands where the Indians hold aboriginal title. *See United States v. Winans*, 198 U.S. 371, 381 (1905) (treaty reserved to the Indians their pre-existing right to fish at all usual and accustomed places); *United States v. Adair*, 723 F.2d 1394, 1413-1414 (9th Cir. 1983), *cert. denied* 467 U.S. 1252 (1984) (tribe's aboriginal title included timber rights, aboriginal hunting and fishing rights, and water right to support its hunting and fishing lifestyle); *Joint Bd. of Control of Flathead, Mission & Jocko Irrigation Dist. v. United States*, 832 F.3d 1127, 1131 (9th Cir. 1987) (treaty preserved aboriginal fishing rights). The doctrine of aboriginal title applies to the lands ceded to the United States by Mexico in the Treaty of Guadalupe Hidalgo. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1160-91 (10th Cir. 2015) (stating that *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941), "reaffirmed principles first

4

established in *Johnson v. M'Intosh*, reaffirmed that aboriginal title is not determined by treaty, and applied the doctrine of aboriginal title to the Mexican cession area").

"*Winans* rights are essentially recognized aboriginal rights." *Abouselman*, 976 F.3d at 1152; 2 Waters and Water Rights § 37.02(a.01) (2025) ("*Winans* rights are in effect aboriginal rights expressly recognized by the federal government, usually in treaties. In these treaties, the Indians reserved (and the government recognized) preexisting uses of water, often for subsistence purposes").

> However, [*Winans* rights] deviate from aboriginal rights in that they are governmentally recognized; their abrogation therefore requires constitutional compensation. But proof of their scope is essentially identical to that required to prove the existence of an aboriginal claim. Thus, the scope of a *Winans* right is dependent on actual use over an extended period of time, although it is not a function of the extent of land title.
>
> *Winans* rights preserve pre-existing uses, rather than establishing new uses. Their priority dates are therefore not related to the establishment of a land reservation but date from pre-white settlement, or "time immemorial." The quantity of *Winans* water rights reserved is not fixed on practicably irrigable acreage but is instead a "needs-based" test. *Winans* rights are unusual in that they commonly are nonconsumptive. A *Winans* right for hunting and fishing purpose "consists of the right to prevent other appropriators from depleting the streams waters below a protected level in any area where the non-consumptive right applies." *Winans* rights also include water to support gathering rights as well as hunting, fishing, and trapping rights. This includes sufficient water to support "productive habitat."

2 Waters and Water Rights § 37.02(a)(2) (2023) (footnotes omitted).

### THE PARTIES' POSITIONS REGARDING ISSUE NO. 3

The Pueblos of Jemez and Zia have executed a settlement of their water rights with the State of New Mexico, the Coalition and the City of Rio Rancho and have not briefed Issue No. 3. *See* United States' Opening Brief at 15 n. 9, Doc. 4528, filed September 9, 2024 (stating the settlement is not binding unless it is approved by Congress and other conditions precedent are

met); Twenty-Sixth Joint Status Report on Congressional Approval Process of the Pueblos of Jemez and Zia Water Rights Settlement Agreement, Doc. 4564, filed September 15, 2025 (stating the Rio Jemez Settlement Legislation is one of several Indian water rights settlement waiting for Congress to act).

**Pueblo of Santa Ana**

The Pueblo of Santa Ana asserts that "Aboriginal water rights are a component of aboriginal title to land, and thus must support the 'habits and modes of life' of the tribe" and "should be sufficient for their needs, including, in the oft-cited words of *Winters*, for 'agriculture and the arts of civilization.'" Santa Ana's Opening Brief at 3-5, Doc. 4530, filed September 9, 2024 ("Santa Ana's Brief"). "Santa Ana's counsel knows of no case that actually purports to quantify aboriginal water rights by *any* standard. This Court must plow new ground here." Santa Ana's Reply at 6, Doc. 4547, filed November 4, 2024 (emphasis in original).

Santa Ana also asserts that "The Treaty of Guadalupe Hidalgo reserved the Tribes' aboriginal Rights to water as they existed under Spain and Mexico, not some fixed quantity of water." Santa Ana's Brief at 5. Santa Ana states "Prior to the arrival of the Spanish, *the Pueblos were able to increase their use of public waters without restriction*." Santa Ana's Brief at 6 (quoting Order Overruling Objections to Proposed Findings and Recommended Disposition Regarding Issues 1 and 2, Doc. 4397, filed September 30, 2017) (Vázquez, J.) (emphasis in Santa Ana's Brief).

Santa Ana also quotes another Order of this Court in another case which states "Pueblos are entitled to federal water rights based on past, present *and future* uses; and Spanish and Mexican law recognized and preserved these [aboriginal] rights and their first priority." Santa

6

Ana's Brief at 7 (quoting Order, Doc. 5642, filed January 31, 2001, in *New Mexico v. Aamodt*, No. 6:66-cv-06639-WJ-WPL) (Mechem, S.J.) ("2001 *Aamodt* Order") (emphasis in Santa Ana's Brief). The statement in the 2001 *Aamodt* Order that the Pueblos are entitled to federal water rights based on future uses is based on an order entered in the *Aamodt* case in 1985. *See New Mexico v. Aamodt*, 618 F.Supp. 993, 1010 (D.N.M. 1985) ("1985 *Aamodt* Order") (stating "The Pueblo aboriginal water right, *as modified by Spanish and Mexican law*, included the right to irrigate new land in response to need") (emphasis added).[1] However, the Pueblos' right to irrigate new land in response to need was not unlimited. "There were two main principles guiding Spain's control of water. First, public waters were held in common and shared by everyone. Second, one could not use public waters to the detriment of other users." *United States v. Abouselman*, 976 F.3d 1146, 1155 (10th Cir. 2020).

The Pueblo of Santa Ana further asserts that "Pueblo aboriginal water rights serve essentially the same purposes as federally reserved rights, and it would make sense that they be quantified in the same manner." Santa Ana states:

> In *Winters*, the Supreme Court established the rule that when the United States sets land aside for an Indian tribe (or for any other special purpose, as subsequent cases have made clear), it impliedly reserves from unappropriated water appurtenant to the land sufficient water to fulfill the purposes of the reservation. *Winters* dealt with the question of whether the waters of the Milk River, which forms the northern border of the Fort Belknap Reservation in Montana, which was set aside as "a permanent home and abiding place of the Gros Ventre and Assiniboing [*sic*: the correct spelling is "Assiniboine"] bands," could be appropriated by non-Indians who had settled upstream of the reservation and had dammed the river and diverted its flow, long after the establishment of the

---

[1] This Court is not bound by an order entered 40 years ago in another District of New Mexico case which resulted in a settlement of other Pueblos' water rights claims. *See* Partial Final Judgment and Decree of the Water Rights of the Pueblos of Nambé, Pojoaque, San Ildefonso, and Tesuque, Doc. 10547, filed March 23, 2016, in *New Mexico v. Aamodt*, No. 6:66-cv-06639-WJ-WPL (approving the parties' settlement agreement).

7

> reservation but before the tribes had begun to make much use of the water. *Id*. at 565-66. The Court noted that the Indians had been nomadic, and had occupied a vast area, but that the government intended, and the tribes agreed, that they should become "pastoral and civilized." That required far less land, but an adequate supply of water, without which the land would be "valueless." *Id.* at 576. The Court concluded that the United States had indeed reserved water for the needs of the tribes, "and for a use that would be necessarily continued through the years." *Id.* at 577. The Court therefore affirmed the decree of the Ninth Circuit Court of Appeals, that had declared that by its establishment of the reservation, the United States had reserved sufficient water from the Milk River "to the extent reasonably necessary to irrigate [the Indians'] lands." *Winters v. United States*, 143 F. 740, 749 (9th Cir. 1906).

Santa Ana's Brief at 8-9 (citing other cases following *Winters* for the proposition that water was reserved for present and future uses). "Santa Ana believes it would make sense to quantify aboriginal rights in the same manner as the Supreme Court found that reserved rights should be quantified, by determining the water rights that would be required to irrigate all of the practicably irrigable acres on the tribe's lands ['PIA standard']." Santa Ana's Brief at 10.

**United States**

> The United States asserts that:
>
> the standard to quantify each Pueblo's aboriginal water rights is: the amount of water used in the past and present by the Pueblos and water necessary in the future to sustain the Pueblo's homeland. The appropriate method to quantify the Pueblos' continued uses of water for irrigation is the practicably irrigable acreage ("PIA") standard. Pueblo uses for domestic, commercial, municipal, and industrial water needs should be based on a calculation of water needed to continue such purposes in the future, based on a projection of a Pueblo's future population.

United States' Opening Brief at 1-2, Doc. 4528, filed September 9, 2024.

> The United States:
>
> does not construe the Court's Order as intending to rule that the Treaty modified the relative water rights priorities of existing Pueblo and non-Pueblo uses during times of wager shortage. The Court makes no such assertion, and there is no language in the Treaty that would support such a position. The United States

8

> recognizes, however, that the Court did not expressly rule on the relative priority of the two groups of rights in times of shortage and therefore seeks clarification on this issue.

United States' Brief at 14-15, 19 ("the United States requests this Court to confirm that the Treaty did not modify the relative water rights priorities of the Pueblos and non-Pueblo Mexican during times of water shortage"). The Court declines to address the United States' request for clarification of the priority issue at this time. The scope of Issue No. 3 is limited to the standard for quantifying the Pueblos' rights. While the Court recognizes that in times of shortage the amount of water available to a party is determined in part by priorities, the Court prefers to make any rulings regarding priorities after briefing by the Parties. The United States may file a motion requesting such a ruling.

**New Mexico**

New Mexico asserts that "the Pueblos' aboriginal water rights must be quantified based on actual use on or before February 2, 1814, the date of the Treaty of Guadalupe Hidalgo." New Mexico's Opening Brief at 2, filed September 9, 2024. New Mexico quotes the Court's 2023 Order which stated:

> The Court concludes that the United States, through the 1848 Treaty of Guadalupe Hidalgo in which it agreed to protect the rights of Pueblo and non-Pueblo Mexican citizens, extinguished the Pueblos' aboriginal water rights, if any, to the water used by non-Pueblo Mexican citizens.
>
> > Only the sovereign may extinguish aboriginal title, whether "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." *Santa Fe*, 314 U.S. at 347, 62 S.Ct. 248. **Extinguishment may also result indirectly through "white settlement and use, authorized by the federal government both statutorily and in fact."** *Jemez I*, 790 F.3d at 1166 (citing *Pueblo of San Ildefonso*, 513 F.2d at 1393). But "[n]o matter the method used, the sovereign's intent to extinguish must be clear and unambiguous." *United States v.*

9

>    *Abouselman*, 976 F.3d 1146, 1156 (10th Cir. 2020).
>
>    *Pueblo of Jemez v. United States*, 63 F.4th 881, 891 (10th Cir. 2023) (entered after completion of briefing by the Parties) (emphasis added). Spain and Mexico allowed non-Pueblos to use the water for approximately 250 years, from about 1598 until 1848, when, in the Treaty of Guadalupe Hidalgo, the United States agreed to protect non-Pueblos' rights recognized by Spain and Mexico. Although the Treaty of Guadalupe Hidalgo did not explicitly state it was terminating the Pueblos' aboriginal rights to any of the water of the Jemez River that Spain and Mexico allowed the non-Pueblos to use, the United States' intent to extinguish the Pueblos' aboriginal rights to the fraction of the flow used by non-Pueblos, given that the amount of the total flow of the Jemez River is finite, is clear and unambiguous. *See Abouselman*, 976 F.3d at 1155 (noting that a main principle guiding Spain's control of water was that "one could not use public waters to the detriment of other users" and that a repartimiento, similar in concept to a water adjudication, occurred only when there was a conflict between users thus indicating that Spain recognized the limited amount of water available in the Jemez River). The non-Pueblos' use of that water is inconsistent with the Pueblos' use of that water.

2023 Order at 11-12. New Mexico argues that "a claimed first priority right to an additional quantity of water from the Jemez River would harm pre-Treaty non-Pueblo water rights because there was no unused "fraction" of the flow in 1848." New Mexico's Opening Brief at 4-8. New Mexico also argues that the Treaty of Guadalupe Hidalgo did not recognize inchoate water rights and "to the extent that Spanish and Mexican law recognized a [colonization, not Indian] pueblo water right, the nature of the right that allowed increased water usage in response to growing needs of the pueblo would have been a matter of grace, not a matter of right . . . the expanding quality of the pueblo right, being inchoate, was not guaranteed by the Treaty." New Mexico's Opening Brief at 8-12 (quoting *State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶¶ 32, 32). Finally, New Mexico argues that "the doctrine of aboriginal title does not support an aboriginal water right to expanding or future uses of water" which requires actual, exclusive and continuous use and occupancy. New Mexico's Opening Brief at 12-16 (stating "there are

10

approximately 1,000 acres of pre-1848 non-Pueblo water rights to the finite and fully appropriated flows of the Jemez River").

**The Coalition**

The Coalition asserts "the Court should not quantify a Pueblo aboriginal right in excess of uses as of 1848" for the following reasons. Coalition's Opening Brief at 27, Doc. 4527, filed September 9, 2024. First, "no additional water is available from the Rio Jemez for a new first priority right," Spain and Mexico allowed non-Pueblos to use water for approximately 250 years, and "although the Treaty of Guadalupe Hidalgo did not explicitly state it was terminating the Pueblos' aboriginal rights to any of the water of the Jemez River that Spain and Mexico allowed the non-Pueblos to use, the United States' intent to extinguish the Pueblos' aboriginal rights to the fraction of the flow used by non-Pueblos, given that the amount of the total flow of the Jemez River is finite, is clear and unambiguous." Coalition's Opening Brief at 4-5 (quoting the 2023 Order). Second, the Treaty of Guadalupe Hidalgo "did not recognize inchoate water rights." Coalition's Opening Brief at 7-8 ("the expanding quality of the Pueblo right [pertaining to the 'pueblos' as towns and not the Indian 'Pueblos"], being inchoate, was not guaranteed by the Treaty" and stating the pueblo right pertaining to towns "is exactly the same 'right' claimed by the Pueblos in the instant case, i.e., a right 'that allowed increased water usage in response to growing needs of the pueblo.'" (quoting *New Mexico ex rel. Martinez v. City of Las Vegas*, 89 P.3d 47, 60 (N.M. 2004). Third, to demonstrate aboriginal title, "'a tribe must prove it had 'actual, exclusive and continuous use and occupancy for a long time,'" and "the additional water [the United States and Pueblos] seek to quanti[f]y for irrigation and other purposes was never actually used by them." Coalition's Opening Brief at 11-14 (quoting *United States v.*

11

*Abouselman*, 976 F.3d 1146, 1156 (10th Cir. 2020).

**Amici Pueblos**

The Pueblo of Sandia, the Pueblo of Cochiti, the Pueblo of Isleta, the Pueblo of San Felipe, the Pueblo of Santa Clara, and the Pueblo of Santo Domingo ("Amici Pueblos") "possess aboriginal water rights that have never been fully quantified." Amici Pueblos' Brief at 3, Doc. 4556, filed April 4, 2025. The Amici Pueblos contend that the Court should reject the State and Coalition's argument that Pueblo aboriginal water rights should be "quantified based on the amount of water actually used on or before February 2, 1818, the date of the Treaty of Guadalupe Hidalgo "because it would be extraordinarily difficult to prove how much water the Pueblos used on or before February 2, 1848, [and] [s]uch a standard would severely disadvantage the most senior water users in New Mexico and unfairly diminish their water rights." Amici Pueblos' Brief at 5. The Amici Pueblos state:

> In the modern era, most water uses are extensively documented through surveys, aerial photography, monitoring gauges, pumping records from groundwater wells, and other means. But there is far less documentation of Pueblo water uses as of, or before, 1848, and the limited records that do exist do not provide anything close to a complete accounting of the amounts of water used by the Pueblos during this period. Pueblos may try to supplement this limited historical record with other types of evidence, such as archaeological or anthropological research, but the passage of nearly two centuries creates formidable challenges to marshalling evidence that meets the standard of proof required in an adjudication. As a result of these evidentiary challenges, Pueblos may be unable to prove the full scope of their pre-1848 water uses—and in some cases they may not be able to prove those uses *at all*—making this standard both impractical and unfair as the measure of the Pueblos' water rights.
>
> [discussing difficulties of determining amount of water use in this case]
>
> The Supreme Court has made clear that courts must consider these types of practical and equitable factors in determining the proper legal standards for quantifying tribal water rights. In *Arizona v. California*, 373 U.S. 546 (1963) ("*Arizona I*"), the Court adopted the PIA standard for quantifying the federally

reserved water rights of Indian tribes on the Colorado River *specifically because* the Court determined that it was "the only *feasible* and *fair* way" to measure the tribes' rights. *Id.* at 601 (emphasis added). The Court explained:

> We … agree with the [Special] Master's conclusion as to the quantity of water intended to be reserved. He found that the water was intended to satisfy the future as well as the present needs of the Indian Reservations and ruled that enough water was reserved to irrigate all the practicably irrigable acreage on the reservations. Arizona, on the other hand, contends that the quantity of water reserved should be measured by the Indians' 'reasonably foreseeable needs,' which, in fact, means by the number of Indians. How many Indians there will be and what their future needs will be can only be guessed. *We have concluded, as did the Master, that the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage.*

*Id.* at 600–01 (emphasis added). Not only did the Court explicitly rely on considerations of feasibility and fairness in selecting the PIA standard, by recognizing PIA as "*the only* feasible and fair" standard, the Court rejected alternative standards—including the "reasonably foreseeable needs" standard proposed by the State of Arizona—on the grounds that these alternatives were *not* practical nor equitable to the tribes. *Id.* at 601 (emphasis added).

Amici Pueblos' Brief at 5-7.

The Court denies the Amici Pueblos' requests to reject the State and Coalition's proposed quantification standard based on pre-1848 water uses and to quantify aboriginal water rights using the PIA standard. The Amici Pueblos' requests are based on the difficulty in proving how much water the Pueblos used on or before February 2, 1848. The Amici Pueblos do not explain whether those difficulties also apply to non-Pueblo water uses on or before February 2, 1848. Issue No. 3 is one of the

> critically important threshold *legal* issues outstanding that, in the interests of judicial economy and the parties' economic resources, must be decided by the Court before the parties can meaningfully prepare for trial and present relevant evidence. . . As to the Pueblos' historic and existing uses, the Special Master conducted evidentiary hearings in 1988 and issued a Report on October 1, 1991 (Dkt. 2291). This Court, in its 2004 Memorandum Opinion and Order ("2004

> Opinion")(Dkt. 4051), ruled that, "because the legal bases for the Pueblos' water rights have yet to be fully resolved, it is premature at this time to act on the Special Master's Report on Historical and Existing Use Claims." Id. at 34.

Parties' Letter to Judge Vázquez, Doc. 4234, filed March 15, 2012 (emphasis added).  The Court limited the Amici Pueblos to addressing the *legal* issue of whether the difficulty of proving the amount of water use prior to 1848 is a factor the Court must consider in quantifying the Pueblo of Santa Ana's water rights under Issue No. 3.  The Amici Pueblos' assertion that it is extraordinarily difficult to prove how much water the Pueblos used on or before February 2, 1848, is, at least in part, a factual issue.  *See* Pueblo of Santa Ana's Supplemental Response Brief on Issue Number 3 at 6, Doc. 4540, filed October 4, 2024 (stating "it would take a complicated factual inquiry to determine what current water uses on the Rio Jemez can plausibly be dated to 1848").  The Court is not persuaded, for the reasons stated below, that the PIA standard is the appropriate standard to quantify the Pueblos' aboriginal rights.

## CONCLUSION

The Court will quantify Santa Ana's aboriginal/*Winans* water rights based on Santa Ana's existing uses at the time of the Treaty of Guadalupe Hidalgo.  There is no legal authority clearly defining the standard for quantifying aboriginal water rights.  To demonstrate aboriginal title, a tribe must prove it had actual, exclusive and continuous use and occupancy for a long time.  While the Pueblos have had actual, exclusive and continuous use and occupancy of their land and a portion of the flow of the Rio Jemez for a long time, they did not exclusively use the entire flow of the Rio Jemez.

The Court is not persuaded that the PIA standard is appropriate for quantifying the Pueblos' aboriginal rights. Aboriginal and *Winans* rights preserve pre-existing uses based on

actual, exclusive use over an extended period of time.  The PIA standard applies when the United States sets land aside for an Indian tribe and impliedly reserves from unappropriated water sufficient water to fulfill the purposes of the reservation.  The United States, in the Treaty of Guadalupe Hidalgo, did not set aside land for the Pueblos and did not impliedly reserve water for the Pueblos.  "In the Treaty of Guadalupe Hidalgo, the United States agreed to protect rights [of Pueblo and non-Pueblo Mexican citizens] recognized by prior sovereigns." *New Mexico v. Aamodt*, 537 F.2d 1102, 1108-1109 (10th Cir. 1976).  Applying the PIA standard to the Pueblo lands could adversely affect the water rights of non-Pueblos that the United States promised to protect.

**Issue No. 4**

The Pueblos and the United States previously stated that "the resolution of Issue No. 4 [Do the Pueblos have *Winters* reserved rights appurtenant to their trust lands and, if so, how are those rights to be measured?] could be affected by the Court's rulings on Issues 2 and 3, and [suggested] that the question whether further briefing on Issue No. 4 is warranted should await the Court's rulings on these issues."  Proposed Scheduling Order at 7, Doc. 4445, filed July 21, 2021.  The Parties completed briefing on Issue No. 4 on October 22, 2012.  *See* Doc's 4273, 4274 and 4276.  The Court orders the Parties to file revised briefs on Issue No. 4 that address any relevant case law arising since the completion of the initial briefing of Issue No. 4.  The Pueblo of Santa Ana and the United States shall file a joint opening brief within 30 days of entry of this Order.  New Mexico and the Coalition shall file a joint response brief within 30 days of service of the opening brief.  The Pueblo of Santa Ana and the United States may file a Joint reply brief within 30 days of service of the response brief.  New Mexico and the Coalition may file a joint

15

surreply within 30 days of entry of the reply brief.

**IT IS SO ORDERED.**

                                                      /S/
                                        **KEA W. RIGGS**
                                        **UNITED STATES DISTRICT JUDGE**